# Exhibit D

**U.S. DEPARTMENT of STATE**

## Saudi Arabia

Country Reports on Human Rights Practices - 2003
Released by the Bureau of Democracy, Human Rights, and Labor
February 25, 2004

Saudi Arabia is a monarchy without elected representative institutions or political parties. It is ruled by King Fahd bin Abd Al-Aziz Al Saud; however, Crown Prince Abdullah has been the de facto ruler since King Fahd suffered a stroke in 1995. The Basic Law sets out the system of government, rights of citizens, and powers and duties of the State. The Basic Law provides that the Islamic holy book the Koran and the Sunna (tradition) of the Prophet Muhammad are the country's Constitution. As custodian of Islam's two holiest sites in Mecca and Medina, the Government bases its legitimacy on governance according to Islamic law. Neither the Government nor the society in general accepts the concept of separation of religion and state. The Majlis al-Shura, an appointed consultative body, debates, rejects and amends government-proposed legislation, holds oversight hearings over government ministries, and has the power to initiate legislation. The Basic Law provides for an independent judiciary; however, high-ranking members of the royal family, who are not required to appear before the courts, and their associates occasionally influenced judges.

The Government maintained effective control of the various security forces. Police and border forces under the Ministry of Interior are responsible for internal security. Also subordinate to the Ministry of Interior are the Mabahith, or internal security force, and the elite special forces. The Committee to Prevent Vice and Promote Virtue, whose agents commonly are known as Mutawwa'in, or religious police, was a semiautonomous agency that enforced adherence to Sunni-Wahhabi Islamic norms by monitoring public behavior. The Crown Prince controls the National Guard. The Deputy Prime Minister and Minister of Defense and Aviation, Prince Sultan, is responsible for all the military forces. Members of the security forces committed human rights abuses.

The population was approximately 24 million. The oil industry was the basis of the transformation of the country from a pastoral, agricultural, and trading society to a rapidly urbanizing one, and the labor market had a large percentage of foreign workers. Oil and gas revenues accounted for approximately 35 to 40 percent of the gross domestic product (GDP) and 75 percent of government income. Agriculture accounted for approximately 6 percent of GDP. Government spending accounted for 37 percent of GDP. Approximately 40 percent of the economy was nominally private. As part of its Saudiization policy, since 1995 the Government has required employers to increase the number of citizens in the public and private work forces.

The Government's human rights record remained poor; although there were positive improvements in a few areas, serious problems remained. Citizens did not have the right to change their government. There were credible reports that security forces continued to torture and abuse detainees and prisoners, arbitrarily arrest and detain persons, and hold them in incommunicado detention. There were cases in which Mutawwa'in continued to intimidate, abuse, and detain citizens and foreigners. There was no evidence that violators were held accountable for abuses. Most trials were closed, and defendants usually appeared before judges without legal counsel. There were reports that the Government infringed on individuals' privacy rights. The Government continued to restrict freedom of speech and press, although there has been an increase in press freedom over a series of years. The Government restricted freedom of assembly, association, religion, and movement. Violence and discrimination against women, violence against children, discrimination against ethnic and religious minorities, and strict limitations on worker rights continued.

The Government announced in October that it would hold the first municipal elections within 1 year. The Government met with organized groups of reform advocates, and in public statements, committed to political, economic and social reforms. The Government established a National Dialogue Center to address differences between different Muslim traditions in the country. There was an increase in press freedom,

with open discussion of previously taboo subjects such as women's rights, political reform, economic reform, Mutawwa'in abuses, government corruption and religious issues. Numerous foreign journalists were issued visas, and permitted to travel and report freely within the country. However, journalists were also sanctioned for criticizing the religious police and for questioning certain religious dogma. After the terrorist bombings in Riyadh on May 12, the Government instituted a program to train Mutaww'in and there was a decline in reported instances of abuse after that date. During the year, the Government permitted the first visit of an international human rights organization, Human Rights Watch (HRW), and held its first human rights conference.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

There were no reports of political killings; however, the Government executed persons for criminal offenses after closed trials making it impossible to assess whether legal protections were applied (see Section 1.e.). In cases involving stoning, amputation or death, sentences must be reviewed by the country's highest court, the Supreme Judicial Council, and can only be enforced pursuant to a Royal Decree issued by the King.

b. Disappearance

There were no reports of politically motivated disappearances.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The Criminal Procedure law prohibits torture and Shar'ia (Islamic law) prohibits any judge from accepting a confession obtained under duress; however, there were credible reports that the authorities abused detainees, both citizens and foreigners. Ministry of Interior officials were responsible for most incidents of abuse of prisoners, including beatings, whippings, and sleep deprivation. In addition, there were allegations of torture, including allegations of beatings with sticks and suspension from bars by handcuffs. There were reports that torture and abuse were used to obtain confessions from prisoners (see Section 1.e.). Canadian and British prisoners that were released during the year reported that they had been tortured during their detention.

The Government continued to refuse to recognize the mandate of the U.N. Committee Against Torture to investigate alleged abuses. A government committee established in 2000 to investigate allegations of torture still had not begun functioning at year's end.

During the year, there were cases in which Mutawwa'in harassed, abused, and detained citizens and foreigners of both sexes. They also brought citizens to police for detention. These incidents were most common in the central region, including the capital, Riyadh, and less frequent in the eastern and western regions of the country. During the year, Mutawwa'in abuses attracted greater public attention than in the past, including in the local press. After the May 12 terrorist attacks, reports of Mutawwa'in abuses declined considerably (see Sections 1.d. and 1.f.).

Unlike in previous years, the Government publicly acknowledged human rights abuses by security forces and began a training program for Mutawwa'in in personal relations. In January and May, the President of the Committee to Promote Virtue and Prevent Vice acknowledged publicly that mistakes had been made and that Mutawwa'in who overstep their authority would be held accountable; however, at year's end, the Government had not charged any security forces with alleged abuses.

The Government punished criminals according to its interpretation of Shari'a. Punishments included imprisonment, flogging, amputation, and execution by beheading. At year's end authorities acknowledged 32 executions, lower than the 43 in the previous year. Executions were for killings, narcotics-related offenses, rape, and armed robbery. The authorities punished repeated thievery and other repeated offenses by amputation of the right hand and left foot. Persons convicted of less serious offenses, such as alcohol-related offenses or being alone in the company of an unrelated person of the opposite sex, sometimes were punished by caning.

Following protests in October, the Government sentenced most of the hundreds of demonstrators arrested throughout the country to varying sentences, many of which included sentences of flogging; however, at year's end, there were no reports that floggings actually occurred (see Sections 1.d., 2.b., and 3.)

Prison and jail conditions varied. Prisons reportedly generally met internationally accepted standards and provided air conditioned cells, good nutrition, regular exercise, and careful patrolling by prison guards. The Government did not permit NGO human rights monitors to visit prisons or jails; however, in October, the Government received the U.N. Special Rapporteur on the independence of judges and lawyers and allowed him access to prisons. Some police stations, deportation centers, and jails, nonetheless, were overcrowded, unsanitary, and not air conditioned. Authorities generally allowed family members access to detainees, but in some cases only after holding detainees for a significant period of time. The Government maintained separate detention facilities for men, women and juveniles.

At year's end, the Committee for Collection of Donations for Impoverished Prisoners announced that 95 prisoners had been released due to the actions of the Committee. The Committee raised over $1.44 million (5.4 million riyals) in order to pay fines resulting from traffic accidents and civil cases. The prisoners were to remain in custody until the fines were paid, regardless of length of sentence.

d. Arbitrary Arrest, Detention, or Exile

The law prohibits arbitrary arrest and detention; however, the authorities at times arrested and detained persons without following explicit legal guidelines. The Mutawwa'in intimidated and brought to police stations persons whom they accused of committing "crimes of vice" based on their own religious interpretations. There were few existing formal procedures to safeguard against abuse, although the Government claimed that it punished individual security officers who violate regulations. There have been few publicized cases of citizens successfully obtaining judicial redress for abuse of the Government's power of arrest and detention. In January, the President of the Committee to Promote Virtue and Prevent Vice said that individual Mutawwa'in were disciplined for infractions. However, the Government did not publicize any cases in which security officials were disciplined for abuses. In June, the press reported a case in which a citizen received a prison sentence and lashes for assaulting a Mutawwa, although he claimed to have been attacked first. On September 30, 2 men in Yanbu were sentenced to 3 years and 3,000 lashes for assaulting Mutawwa'in who allegedly were beating a woman they suspected of being in the presence of a male who was not her relative.

The law provides that authorities may not detain suspects for more than 3 days without charging them. However, in practice persons were held weeks or months and sometimes longer. The regulations also provides for bail for less serious crimes, although authorities at times released detainees on the recognizance of a patron or sponsoring employer without the payment of bail. If they were not released, authorities typically detained accused persons for an average of 2 months before sending the case to trial or, in the case of some foreigners, summarily deporting them. There were no established procedures providing detainees the right to inform their family of their arrest.

On March 24, the Government released Islamist dissident Shaykh Sa'eed bin Za'er after more than 8 years in prison. Shaykh Za'er was originally arrested in 1995 after publicly condemning former Grand Mufti Shakh Abd al-Aziz bin Baz's fatwa permitting peace with Israel. On October 28, the press reported that the Government released over 100 prisoners in honor of Ramadan, with approximately 100 juvenile delinquents and first time offenders also pardoned.

The Mutawwa'in have the authority to detain persons for no more than 24 hours for violations of the strict standards of proper dress and behavior. In the past, they sometimes exceeded this limit before delivering detainees to the police (see Section 1.f.). Procedures required a police officer to accompany the Mutawwa'in at the time of an arrest. Mutawwa'in generally complied with this requirement. During the year, in the more conservative Riyadh district, reports continued of Mutawwa'in accosting, abusing, arresting, and detaining persons alleged to have violated dress and behavior standards. Reported incidents of harassment by the Mutawwa'in declined following the May 12 terrorist bombings in Riyadh.

The Mutawwa'in reportedly detained young men for offenses that included eating in restaurants with young women, making lewd remarks to women in the shopping malls, or walking in groups through family-only sections of shopping centers. Women of many nationalities were detained for actions such as riding in a taxi with a man who was not their relative, appearing with their heads uncovered in shopping malls, and eating in restaurants with males who were not their relatives. Many such prisoners were held for days, sometimes weeks, without officials notifying their families or, in the case of foreigners, their embassies.

There were cases in which the Government arrested and detained Christians, at times for holding services and at times apparently arbitrarily (see Section 2.c.).

In 2002, the Government arrested six leaders of the Ismaili Shi'ite sect in Najran. They continued to be

detained along with a reported 93 others held since the protests there.

Political detainees who are arrested by the General Directorate of Investigation (GDI), the Ministry of Interior's security service (Mabahith), have been held incommunicado in special prisons during the initial phase of an investigation, which may last weeks or months. The GDI allowed the detainees only limited contact with their families or lawyers.

The authorities may detain without charge persons who publicly criticize the Government, or may charge them with attempting to destabilize the Government (see Sections 2.a. and 3). In May, King Fahd ordered that a large number of prisoners, both citizens and foreigners, be released who had been convicted of minor crimes including intoxication, assault, and theft, but who had no previous criminal records. Following the October 14 and October 23 demonstrations in a number of cities, authorities arrested and detained hundreds of political protesters for weeks prior to charging them (see Sections 1.c., 2.a. and 3).

The Government continued to commit abuses against members of the Shi'a Muslim minority. Government security forces reportedly arrested Shi'a based on the smallest suspicion, held them in custody for lengthy periods, and then released them without explanation. At year's end, an unknown number of Shi'a remained in prison.

The Public Security Department in Jeddah discourages abuse by security forces through hotlines (including telephone and fax numbers and an e-mail address) for use by the general public. These hotlines allowed the public to complain about any breach of law by security personnel and to report abuse by police officers. During the year, the department established a special task force to act on complaints and proposals from the public.

There was no reliable information about the total number of political detainees.

The Government did not use forced exile; however, it previously revoked the citizenship of opponents of the Government who reside outside the country (see Section 3).

e. Denial of Fair Public Trial

The independence of the judiciary is prescribed by law and was generally respected in practice; however, high-ranking members of the royal family who were not required to appear before the courts, and their associates, occasionally influenced judges. Judges are appointed by the Justice Ministry and confirmed by the Royal Diwan (Royal Court). The Ministry exercised judicial, financial, and administrative control of the courts. The Supreme Judicial Council, whose members appointed by the King, may discipline or remove judges.

The legal system is based on Shari'a. Shari'a courts exercise jurisdiction over common criminal cases and civil suits regarding marriage, divorce, child custody, and inheritance. Such jurisdiction extends to non-Muslims for crimes committed in the country. Shari'a courts base judgments largely on their interpretation of the Koran and the Sunna. Cases involving relatively small penalties were tried in Shari'a summary courts. More serious crimes were adjudicated in Shari'a courts of common pleas. Appeals from Shari'a courts were made to the courts of appeal.

Other civil proceedings, including those involving claims against the Government and enforcement of foreign judgments, were held before specialized administrative tribunals, such as the Commission for the Settlement of Labor Disputes and the Board of Grievances.

The Government permitted Shi'a Muslims to use their own legal tradition to adjudicate cases involving domestic issues, inheritance, and Islamic endowments. However, there were only two judges, which was insufficient to handle the large Shi'a population in the Eastern Province. There was no comparable right for non-Muslims or foreigners, whose cases were handled in regular Shari'a courts.

The military justice system has jurisdiction over uniformed personnel and civil servants that are charged with violations of military regulations. The Minister of Defense and Aviation and the King review the decisions of courts-martial.

The Supreme Judicial Council is not a court and may not reverse decisions made by a court of appeals. However, the Council may review lower court decisions and refer them back to the lower court for reconsideration

The Council of Senior Religious Scholars is an autonomous body of 20 senior religious jurists, including the Minister of Justice. It establishes the legal principles to guide lower-court judges in deciding cases. In 2002, the Criminal Procedural Law went into effect. Reported by the press as a bill of rights, the 225-article

law reportedly was part of a plan to restructure court procedures. The approval of the bill followed the Government's decision to allow persons under investigation the right to a lawyer and to permit lawyers to present arguments in criminal courts. In 2002, following the announcement of the new law's implementation, the Justice Minister issued a public statement announcing his instructions to courts and judges to inform convicts of their right to appeal rulings. It was not clear whether this law was being consistently implemented.

There were reports during the year that the authorities tortured detainees and pressured them to confess by isolation and blindfolding over a period of weeks (see Section 1.c.).

A woman's testimony does not carry the same weight as that of a man. In a Shari'a court, the testimony of one man equals that of two women. Under the Hanbali interpretation of Shari'a law, judges may discount the testimony of persons who are not practicing Muslims or who do not adhere to the correct doctrine. Legal sources reported that testimony by Shi'a is often ignored in courts of law or is deemed to have less weight than testimony by Sunnis. Sentencing under the legal system was not uniform. Laws and regulations state that defendants should be treated equally; however, under Shari'a as interpreted and applied in the country, crimes against Muslims may result in harsher penalties than those against non-Muslims.

Female parties to court proceedings such as divorce and family law cases generally must deputize male relatives to speak on their behalf. In the absence of two witnesses, or four witnesses in the case of adultery, confessions before a judge almost always were required for criminal conviction--a situation that has led prosecuting authorities to coerce confessions from suspects by threats and abuse (see Section 1.c.).

Laws and regulations state that defendants should be treated equally; however, crimes against Muslims received harsher penalties than those against non-Muslims. Sentencing was not uniform. In the case of wrongful death, the amount of indemnity or "blood money" (compensation) awarded to relatives varied with the nationality, religion, age, and sex of the victim. A sentence may be changed at any stage of review, except for punishments stipulated by the Koran. In November, six prisoners who had admitted to murder agreed to pay "blood money" to victims' families in order to avoid the death penalty.

Hindus are considered polytheists by Islamic law, which is used as a justification for greater discrimination in calculating accidental death or injury compensation. According to the country's "Hanbali" interpretation of Sharia (Islamic law), once fault is determined by a court, a Muslim male receives 100 percent of the amount of compensation determined, a male Jew or Christian received 50 percent, and all others (including Hindus) received 1/16 of the amount a male Muslim receives. Women receive 50 percent of what males receive in each of these categories.

Provincial governors (almost all of whom are members of the royal family) have the authority to exercise leniency and reduce a judge's sentence. In general, members of the royal family and other powerful families were not subject to the same rule of law as ordinary citizens.

The King and his advisors reviewed cases involving capital punishment. The King has the authority to commute death sentences and grant pardons, except for capital crimes committed against individuals. In such cases, he may request the victim's next of kin to pardon the killer--usually in return for compensation from the family or the King.

There was insufficient information to determine the number of political prisoners. The Government did not provide information regarding such persons or respond to inquiries about them. It did not allow access to political prisoners by international humanitarian organizations. Moreover, the Government conducted closed trials for persons who may have been political prisoners and in other cases has detained persons incommunicado for long periods while under investigation.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The Basic Law guarantees the inviolability of homes and the privacy of correspondence. The Criminal Procedure Law requires authorities to obtain a warrant prior to searching a residence, or a court order prior to perusing personal correspondence or documents. The Government generally respected this inviolability in practice; however, there were cases in which the Government infringed on these rights. Royal decrees include provisions calling for the Government to defend the home from unlawful intrusions, while laws and regulations prohibit officials from intercepting mail and electronic communication except when necessary during criminal investigations.

The police generally must demonstrate reasonable cause and obtain permission from the provincial governor before searching a private home; warrants are required by law in most cases.

Customs officials routinely opened mail and shipments to search for contraband, including material deemed pornographic and non-Sunni Muslim religious material. Customs officials confiscated or censored materials considered offensive, including Christian Bibles and religious videotapes (see Section 2.c.). The authorities also opened mail and used informants and wiretaps in internal security and criminal matters. Security forces used wiretaps against foreigners suspected of alcohol-related offenses. Informants and an informal system of ward bosses in some districts reported "seditious ideas," antigovernment activity, or behavior contrary to Islam in their neighborhoods to the Ministry of the Interior.

The Government enforced most social and Islamic religious norms, the Government's interpretations of which are matters of law (see Section 5). Women may not marry noncitizens without government permission; men must obtain government permission to marry noncitizen women outside the six states of the Gulf Cooperation Council. In accordance with Shari'a, women are prohibited from marrying non-Muslims; men may marry Christians and Jews, as well as Muslims. Marriages between Sunni and Shi'a citizens were discouraged, and any such marriages generally were made formal through ceremonies in Bahrain.

The Government imposes restrictions on the right of certain Government employees to marry foreigners. The Government bars top civil servants and security officials from marrying foreigners without permission from the King. The list of positions subject to this restriction included ministers, judges, employees in the Royal Court and Cabinet, Majlis al-Shura members, diplomats and administrative staff in the Foreign Ministry, civil servants posted overseas, chairmen of boards of private companies, staff of the Defense Ministry, National Guard, internal security, intelligence service, public prosecution and customs. The marital restrictions also applied to citizens studying overseas on government scholarships. Violators risked disciplinary action; however, this policy was rarely violated and there were no reports of sanctions being imposed.

Mutawwa'in practices and incidents of abuse varied widely in different regions of the country, but they were most numerous in the central Nejd region. In certain areas, both the Mutawwa'in and religious vigilantes acting on their own harassed, abused, arrested, and detained citizens and foreigners (see Section 1.d.). The Government requires the Mutawwa'in to follow established procedures and to offer instruction in a polite manner; however, Mutawwa'in did not always comply with the requirements. During the year, the President of the Committee to Promote Virtue and Prevent Vice publicly acknowledged abuses by individual Mutawwa'in and said violators were subject to discipline. The Government began a training program for Mutawwa'in. Incidents of abuses by Mutawwa'in declined following the May 12 terrorist attacks.

Mutawwa'in enforcement of strict standards of social behavior included the closing of commercial establishments during the five daily prayer observances, insisting upon compliance with strict norms of public dress, and dispersing gatherings of women in public places designated for men, as well as preventing men from entering public places designated for families. Mutawwa'in frequently reproached citizen and foreign women for failure to observe strict dress codes and arrested men and women found together who were not married or closely related.

Incidents with Mutawwa'in usually increased during Ramadan because many feel they have added license to assert their authority during the holy month.

Some professors believed that informers monitor comments made in university classrooms and reported them to government authorities.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The Basic Law states that the media's role is to educate the masses and boost national unity and that it can be banned if it gives rise to mischief and discord, compromises the security of the State and its public image, or offends man's dignity and rights and the Government continued to restrict freedom of speech and press although there has been an increase in press freedom over a series of years. The Government sanctioned several journalists for articles and commentaries critical of the religious authorities and conservative Muslim theology, particularly after the May 12 terrorist attacks. Journalists also practiced some self-censorship, refraining from direct criticism of Government officials. There were no reports of journalists being imprisoned.

Newspapers reported on previously taboo subjects including political, economic and educational reform, women's rights, corruption, and religion. Newspapers carried stories about elections in neighboring Gulf countries, and reported on reform discussions within the country.

The press has some freedom to criticize governmental bodies and social policies through editorial comments and cartoons. During the year, both Arabic and English newspapers reported on domestic problems, such as abuse of women, servants, and children, previously not addressed by the media (see Section 5).

During the year, the Grand Mutfi issued a fatwa (religious ruling) denouncing incitement to violence and disparagement of other religions and in some instances, the Government has banned imams from speaking on political issues (see Section 2.c.).

The print media were privately owned but publicly subsidized. A media policy statement and a national security law prohibit the dissemination of criticism of the Government. The media policy statement urged journalists to uphold Islam, oppose atheism, promote Arab interests, and preserve cultural heritage. The Ministry of Information appointed, and may remove, all editors in chief. During the year, the Government removed the editor of Al Watan newspaper following a series of articles and cartoons criticizing religious authorities and questioning elements of conservative Islam. This editor was provided another position and later allowed to resume writing for the newspaper. The Government also provided guidelines to newspapers regarding controversial issues. The Government owned the Saudi Press Agency (SPA), which expressed official government views.

In February, the Government granted a charter to a professional journalists' association. The association began registering members, opening membership to all journalists in the country or abroad who have worked in the profession for three years or longer. Both men and women are members, and non-citizen journalists working in the country are eligible to join as non voting members. The association's stated goal will be to organize the journalists, coordinate relations with employers, support the development of job-related skills, and encourage innovation.

In the past, newspapers typically published news on sensitive subjects only after the information was released by the SPA or when a senior government official had authorized it; however, this was less common during the year. Newspapers routinely investigated and published stories on crime and terrorism without senior government prior authorization. Two Saudi-owned, London-based dailies, Al-Sharq Al-Awsat and Al-Hayat, were distributed widely and read in the country. Both newspapers practiced some degree of self-censorship in order to comply with government guidelines on sensitive issues.

The Government owned and operated the television and radio companies. Government censors removed any reference to politics, religions other than Islam, pork or pigs, alcohol, and sex from foreign programs and songs. There were several million satellite-receiving dishes in the country, which provided citizens with foreign broadcasts.

The Government was more open to media coverage than in the past. In March, the Majlis al-Shura allowed partial television coverage of its proceedings and allowed journalists to attend sessions. There was frequent coverage in the press of Majlis proceedings and votes. The Ministry of Foreign Affairs began regular press conferences for journalists. In February, in an unprecedented development, the government-owned Saudi television station was the first news source to break the story of the terrorist shooting of a British expatriate by a citizen. And following the May 12 terrorist attacks, the Saudi press carried timely and accurate coverage of the attacks and the subsequent government campaign against terrorism in the country. In several cases, government security agencies permitted journalists to film anti-terrorist operations in progress, which were broadcast on Saudi television.

Unlike in previous years, the Government permitted domestic newspapers to release stories about the country that were based on stories in the foreign press. Access by citizens to outside sources of information, such as Arabic and Western satellite television channels and the Internet, was widespread.

In the past, the Government restricted the entry of foreign journalists. However, during the year, it granted visas to a large number of international media professionals. The Government allowed foreign journalists and photographers, both male and female, to travel freely and to interview. In one case, police detained and confiscated the film of a reporter photographer for the English-language newspaper Arab News, who was covering an incident in which a dozen pilgrims were killed during the Hajj. The newspaper subsequently published an article criticizing the actions of the police.

During the year, newspapers published stories, editorials, and letters on education reform, both in support

and opposition. In October, the Saudi Gazette published an article in which schoolteachers were interviewed who criticized the Government for revisions to the new school textbooks, including the removal of passages on dealing with Muslims and non-Muslims.

The Government banned all books, magazines, and other materials that it considered sexual or pornographic in nature. The Ministry of Information compiled and updated a list of publications that were prohibited from being sold in the country.

The Government censored most forms of public artistic expression and prohibited cinemas and public musical or theatrical performances, except those that are considered folkloric.

Access to the Internet was available legally only through local servers, which the Government monitored closely. There were as many as one million Internet subscribers. Some citizens attempted to circumvent this control by accessing the Internet through servers in other countries. The Government attempted to block W=web sites that it deemed sexual, pornographic, politically offensive, or "un-Islamic." However, such web sites were accessible from within the country.

There was a report that a university professor was banned from teaching and traveling for criticizing the Government's discriminatory policies against Shi'a.

Academic freedom was restricted. The Government prohibited the study of evolution, Freud, Marx, Western music, and Western philosophy. Informers monitored their classroom comments and reported to government and religious authorities.

b. Freedom of Peaceful Assembly and Association

The Basic Law does not address freedom of association or assembly, and the Government strictly limited it in practice and prohibited public demonstrations as a means of political expression. In October, several hundred persons demonstrated in Riyadh and other cities in a protest organized by the London-based Movement for Islamic Reform. Police broke up the protest and arrested most of the demonstrators (see Sections 1.c., 1.d. and 3). In March, during the Shi'a Ashura observance in Qatif, the Government permitted approximately 10,000 people to gather for a sermon. Public meetings were segregated by sex. Unless sponsored by diplomatic missions or approved by the appropriate governor, foreign residents who seek to hold unsegregated meetings risked arrest and deportation. The authorities monitored any large gatherings of persons, particularly women. The Mutawwa'in dispersed groups of women found in public places, such as restaurants. Government policy permits women to attend cultural and social events if accompanied by a father, brother or husband; however, the policy was not consistently enforced.

The Government prohibited the establishment of political parties or any type of opposition group (see Section 3). However, groups of reform supporters organized several petitions that they presented to the Government, and the group met with the Crown Prince. The Government licensed a journalists' association, approved the establishment of an independent non-governmental human rights organization, and announced plans to form a bar association (see Section 4). The Government licensed a large number of humanitarian organizations and tribal and professional societies, such as the Saudi Chemists Society and the Saudi Pharmacists Society.

c. Freedom of Religion

The Government does not provide legal protection for freedom of religion and such protection did not exist in practice. Freedom of religion did not exist. Islam is the official religion, and the law provides that all citizens must be Muslims.

The Government prohibited non-Islamic public worship. The Government informally recognized the right of non-Muslims to worship in private; however, it did not always respect this right in practice. In general, non-Muslims were able to worship privately, but must exercise great discretion to avoid attracting attention. Conversion by a Muslim to another religion was considered apostasy. Public apostasy is a crime under Shari'a and, according to the Government's interpretation, is punishable by death. There were no executions for apostasy during the year, and no reports of any such executions for the past several years.

During the year, the Government initiated an effort to encourage moderation and greater respect for religious diversity. In addition to statements by the Crown Prince, Grand Mufti, and other leaders throughout the year, in June the Government initiated a National Dialogue that brought together leaders from different Muslim traditions in the country. The conference issued a statement acknowledging that theological diversity within Islam is "natural." Following the meeting, the Government established a

permanent center for national dialogue.

Islamic practice generally was limited to strict adherence of the so-called "Wahhabi" interpretation of the Hanbali school of the Sunni branch of Islam as promulgated by Muhammad Ibn Al Wahab, a puritanical 18th century religious reformer. The spreading of Muslim teachings not in conformity with the officially accepted interpretation of Islam was prohibited. However, there were significant numbers of Sufis in the western province who engaged in technically illegal practices, such as celebrating the Mawlid, or Prophet's birthday without government interference. The practice of other schools of Sunni Islam was discouraged, and adherents of the Shi'a branch of Islam faced institutionalized discrimination, including restrictions on religious practice and on the building of mosques and community centers. The Ministry of Islamic Affairs directly supervised, and was a major source of funds for the construction and maintenance of most mosques in the country. The Ministry paid the salaries of imams (prayer leaders) and others who worked in the mosques. On occasion, the Government provided direction to mosque orators and imams regarding the content of their messages; in some instances, imams were banned from speaking. A governmental committee was responsible for defining the qualifications of imams. The Mutawwa'in received their funding from the Government and were government employees. The General President of the Mutawwa'in held the rank of cabinet minister.

Foreign imams were barred from leading worship during the most heavily attended prayer times and prohibited from delivering sermons during Friday congregational prayers. The Government stated that its actions were part of its "Saudiization" plan to replace foreign workers with citizens. Writers and other individuals who publicly criticized this interpretation, including both those who advocated a stricter interpretation and those who favored a more moderate interpretation than the Government's, risked sanctions. Several journalists who wrote critically about the religious leadership or who questioned theological dogma were temporarily banned from writing or traveling abroad.

The Shi'a Muslim minority (approximately 2 million of approximately 17 million citizens) lived mostly in the Eastern Province, although a significant number also resided in Medina in the western province. Its members were the objects of officially sanctioned political, social, and economic discrimination (see Section 5).

The authorities permitted the celebration of the Shi'a holiday of Ashura in the eastern province city of Qatif, including a public sermon by a leading Shi'ite cleric before 10,000 worshipers. The police monitored the celebrations. No other public Ashura celebrations were permitted in the country, and many Shi'a traveled to Qatif or to Bahrain to participate in Ashura celebrations. The Government continued to enforce other restrictions on the Shi'a community, such as banning Shi'a books.

Unlike in previous years, the Government issued permits to construct Shia mosques and a new mosque was constructed in Qatif. The Shi'a have declined government offers to build state-supported mosques because the Government would prohibit the incorporation and display of Shi'a motifs in any such mosques.

Magic was widely believed in and sometimes practiced; however, under the Government's interpretation of Shari'a the practice of magic was regarded as the worst form of polytheism, an offense for which no repentance was accepted, and which was punishable by death. There were an unknown number of detainees held in prison on the charge of "sorcery," or the practice of "black magic" or "witchcraft." The press reported several cases in which police arrested persons accused of sorcery. There was no information available on prison time or punishment.

The Government prohibited public non-Muslim religious activities. Non-Muslim worshippers risked arrest, lashing, and deportation for engaging in overt religious activity that attracts official attention. The Government has stated publicly, including before the U.N. Commission on Human Rights, that its policy is to protect the right of non-Muslims to worship privately. During the year, senior officials in the Government publicly re-affirmed this right, while also asserting that no church would be allowed to be built in the country. However, the Government did not provide explicit guidelines-such as the number of persons permitted to attend and acceptable locations-for determining what constitutes private worship, which made distinctions between public and private worship unclear. Such lack of clarity, as well as instances of arbitrary enforcement by the authorities, forced most non Muslims to worship in such a manner as to avoid discovery by the Government or others. Authorities deported those detained for non-Muslim worship almost always after sometimes-lengthy periods of arrest.

At year's end, there were no reports that Christians detained for practicing their religion remained in prisons. During the year, there were a few raids, arrests, and detentions of Christians throughout the

country, although fewer than in the past. The Mutawwa'in arrested four expatriate Protestants and imprisoned them without charge for three weeks prior to turning them over to the Ministry of the Interior. All were subsequently released and deported. In September, the Mutawwa'in arrested 16 expatriate workers in al-Jouf for practicing Sufism. On October 25, two Egyptian Christians were arrested and jailed. Both were released on November 13. Several other expatriate Protestants were arrested in Riyadh in October by regular police and released the same day without charge.

The Government did not permit non-Muslim clergy to enter the country for the purpose of conducting religious services, although some came under other auspices. Such restrictions made it very difficult for most non-Muslims to maintain contact with clergymen and attend services. Catholics and Orthodox Christians, who require a priest on a regular basis to receive the sacraments required by their faith, particularly were affected. However, since May, there have been few reports of non-Muslim worshipers being harassed by the Mutawwa'in.

Proselytizing by non-Muslims, including the distribution of non-Muslim religious materials such as Bibles, was illegal. There were no reports during the year of arrests for proselytizing. Muslims or non-Muslims wearing religious symbols of any kind in public risked confrontation with the Mutawwa'in. Under the auspices of the Ministry of Islamic Affairs, approximately 50 so-called "Call and Guidance" centers employing approximately 500 citizens to convert foreigners to Islam. Some non-Muslim foreigners converted to Islam during their stay in the country. The press often carried articles about such conversions, including testimonials.

Under the Hanbali interpretation of Shari'a law, judges may discount the testimony of persons who are not practicing Muslims or who do not adhere to the correct doctrine.

Islamic religious education was mandatory in public schools at all levels. All children received religious instruction, which generally was limited to that of the Hanbali school of Islam.
In accordance with the religious establishment's interpretation of Shari'a, women were prohibited from marrying non-Muslims, but men were permitted to marry Christians and Jews, as well as Muslims.

The Government required noncitizens to carry Iqamas, or legal resident identity cards, which contained a religious designation for "Muslim" or "non-Muslim." There were reports that individual Mutawwa'in pressured Saudi sponsors not to renew Iqamas, which had been issued for employment, of individuals for religious reasons.

Shi'a citizens were discriminated against in government and employment, especially in national security jobs. Shi'a were subjected to employment restrictions in the oil and petrochemical industries and some Shi'a who were suspected of subversion have been subjected periodically to surveillance and limitations on travel abroad.

Unlike in previous years, there were no new cases reported in which children of citizen fathers were coerced to conform to their father's interpretation of Islam. The press reported in December that the Committee for the Promotion of Virtue and the Prevention of Vice warned shopkeepers in the Eastern Province not to sell New Year's or Christmas gifts or decorations. The warning also reminded employers not to allow their staff to celebrate either holiday openly.

In December, the press reported on a trial of a citizen schoolteacher charged with apostasy.

For a more detailed discussion, see the 2003 International Religious Freedom Report.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

Citizen men have the freedom to travel within the country and abroad; however, the Government restricted these rights for women based on its interpretation of Islamic Law. All women in the country were prohibited from driving and were dependent upon males for any transportation. Likewise, they must obtain written permission from a male relative or guardian before the authorities allowed them to travel abroad (see Section 5). The requirement to obtain permission from a male relative or guardian applied also to foreign women married to citizens or to the minor and single adult daughters of Saudi fathers. Since 2001, women have been able to obtain their own identity cards; however, the Government requires that they obtain permission to receive a card from a male relative or guardian (see Section 5). The restrictions on travel also applied to American citizen children of citizen fathers. In cases where there were custody disputes between American women and their citizen husbands, the husband was able to prevent the travel of the children to the United States even when there was a valid U.S. custody order. These restrictions on travel can continue even after female children reach adulthood, although the Government has worked with U.S.

consular officials to overcome a father or husband's refusal to permit the travel of adult American citizen female relatives. During the year, senior officials considered, on a case-by-case basis, allowing adult American citizen women to travel despite objections by their husband, father, or other male relative or guardian. Foreigners typically were allowed to reside or work in the country only under the sponsorship of a citizen or business. By law, the sponsors or employers of foreign residents must hold their passports until they are prepared to depart the country. The Government required foreign residents to carry identification cards. It did not permit foreigners to change their workplace without their sponsor's permission.

Over 100,000 native residents live in the country without possessing citizenship of any nation. They are collectively known as "bidoons," ("without" in Arabic). These are native born residents who lack citizenship due to an ancestor's failure to obtain Saudi nationality, including descendents of nomadic tribes such as the Anaiza and Shammar, whose ancestors were not counted among the native tribes during the reign of King Abd al Aziz; descendants of foreign-born fathers who emigrated to the country before citizenship was institutionalized; and rural migrants whose parents failed to register their births. Because of their lack of citizenship, they are denied employment and educational opportunities, and have a limited ability to travel. Bidoons are among the poorest residents of the country, and reside at the margins of society.

The Law prohibits employers from retaining foreign workers' passports. However, some sponsors often retained possession of foreign workers' passports, although some classes of foreign workers were allowed to keep their passports. Foreign workers must obtain permission from their sponsors to travel abroad. If sponsors were involved in a commercial or labor dispute with foreign employees, they may ask the authorities to prohibit the employees from departing the country until the dispute is resolved. Some sponsors used this as a pressure tactic to resolve disputes in their favor or to have foreign employees deported. There were reports of the Government prohibiting foreign employees involved in labor disputes from departing the country until the dispute was resolved (see Sections 5 and 6.c.).

The Government seized the passports of all potential suspects and witnesses in criminal cases and suspended the issuance of exit visas to them until the case was concluded. As a result, some foreign nationals were forced to remain in the country for lengthy periods against their will. The authorities sometimes confiscated the passports of suspected oppositionists and their families.

Citizens may emigrate. The Government prohibited dual citizenship; however, children who hold other citizenship by virtue of birth abroad increasingly were permitted to leave the country using non-Saudi passports. Apart from marriage to a citizen, there were no provisions for foreign residents to acquire citizenship. Children born to a citizen father acquired Saudi citizenship. However, a citizen mother may not convey citizenship to her children. Foreigners were granted citizenship in rare cases, generally through the advocacy of an influential patron.

The law does not provide for the granting of refugee status or asylum to persons who meet the definition in the 1951 U.N. Convention Relating to the Status of Refugees and its 1967 Protocol; however, the Basic Law provides that "the state will grant political asylum, if so required by the public interest."

Of the 33,000 Iraqi civilians and former prisoners of war allowed refuge in the country at the end of the Gulf War, none were granted permanent asylum. The Government has underwritten the entire cost of providing safe haven to the Iraqi refugees and continued to provide logistical and administrative support to the UNHCR and other resettlement agencies. At the beginning of the year, approximately 5,200 remaining refugees were restricted to the Rafha Refugee Camp. The UNHCR has monitored more than 3,000 persons voluntarily returning to Iraq from Rafha since December 1991 and found no evidence of forcible repatriation (see Section 1.c.).

Following the Coalition-led war with Iraq, the Government, in cooperation with the U.N. High Commissioner for Refugees (UNHCR), the U.S. Embassy, and the Coalition Provisional Authority in Iraq, began to repatriate Iraqi refugees from the Rafha refugee camp, which housed former Iraqi prisoners of war and civilians who fled Iraq following the Gulf War. Prior to the repatriation, UNHCR officials reported that there was no systematic abuse of refugees by camp guards. When isolated instances of abuse surfaced in the past, the authorities were responsive and willing to investigate allegations and reprimand or remove offending guards. The camp received a high level of material assistance and was generally comfortable and well run. At year's end, 4,562 refugees had been returned to Iraq. Virtually all refugees have registered with UNHCR for repatriation.

The Government has allowed some foreigners to remain temporarily in the country in cases in which their safety would be jeopardized if they were deported to their home countries.

There were no reports of the forced return of persons to a country where they feared persecution.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

Citizens do not have the right to change their Government. The Basic Law states that the Government is established on the principal of "Shura" or consultation, and requires the King and Crown Prince to hold open Majlises. The Basic Law states that all individuals have the right to communicate with public authorities on any issue. There were no formal democratic institutions, and only a few members of the ruling family had a voice in the choice of leaders or in changing the political system. The King ruled on civil and religious matters within limitations established by the Basic Law, religious law, tradition, and the need to maintain consensus among the ruling family and religious leaders.

The King is also the Prime Minister, and the Crown Prince served as Deputy Prime Minister. The King appointed all other ministers, who in turn appointed subordinate officials with cabinet concurrence.

During the year, the Government announced a restructuring of the country into 14 municipal regions, and that the council seats will be 50 percent elected and 50 percent appointed. In January, Crown Prince Abdullah called for political, economic and social reform in the Arab world, including increased participation by citizens in government. In January, April, and September, organized groups of citizens submitted petitions to the Government calling for detailed reforms, including democratic elections. The Government met with these groups, and in May, a speech was delivered on behalf of the King to the Majlis al-Shura committing the Government to a program of reforms, including citizen participation in government and expanded rights for women.

The Majlis al-Shura, or consultative council, consists of 120 appointed members and is divided into 11 committees. It was created in 1992 by King Fahd, and in the past year has taken on an increasing important political role. The Majlis reviews and votes on legislation, and often suggest amendments to the Government. The Government generally accepts amendments made by the Majlis. In January, the Majlis voted to reject a Government proposed income tax on foreigners; and this decision was not overturned by the Government. The Majlis held hearings with Government officials to review the performance of their ministries, and has the power to subpoena documents. In April, the Majlis was admitted as a member of the International Parliamentary Union (IPU), upon a unanimous vote by the IPU. In October, newspapers reported that the Government would conduct elections for one-third the seats on the Majlis al-Shura within 3 years.

The Council of Senior Islamic Scholars (ulema) is another advisory body to the King and the Cabinet. It reviews the Government's public policies for compliance with Shari'a. The Government viewed the Council as an important source of religious legitimacy and takes the Council's opinions into account when promulgating legislation.

Communication between citizens and the Government traditionally has been expressed through client-patron relationships and by affinity groups such as tribes, families, and professional hierarchies. In theory, any male citizen or foreign national may express an opinion or a grievance at a majlis, an open-door meeting held by the King, a prince, or an important national or local official. During the year, Crown Prince Abdullah held a variety of meetings with citizens throughout the country. Ministers and district governors can be approached for discussion at a majlis.

In April, a group of Shi'a submitted a petition to the Crown Prince calling for similar reforms, and drawing attention to the discrimination against the country's Shi'a minority. In December, a group of citizen intellectuals and citizen women sent two separate petitions to the Crown Prince in response to the pace of reform efforts. One petition called for a constitutional monarchy, and the petition submitted by over 300 women called for greater rights for women in the country, and greater recognition of their contributions to society.

The extremist Committee for the Defense of Legitimate Rights (CDLR), established in 1993, and its rival faction, the Movement for Islamic Reform, established in 1996, continued to criticize the Government, using computers and fax transmissions to send newsletters from London to the country. Both were repressed by the Government and have no officially recognized existence. Following an October 14 demonstration in Riyadh, hundreds of citizens gathered October 23 in Riyadh, Jeddah, Dammam and Ha'il. The Government arrested most of the demonstrators, detained many of them for a period of time without sentencing, then sentenced most to varying sentences ranging from imprisonment to flogging (see Sections 1.c., 1.d. and 2.b.).

Women played no formal role in government and politics. Participation by women in a majlis was restricted,

although some women sought redress through female members of the royal family. On several occasions, women have been called to advise members of the Majlis al-Shura in private, closed-door sessions. During the year, in several governorates, womens' councils have been formed to advise local governors on issues concerning women. There were no women or religious minorities in the Cabinet, and there were only 2 Shi'a in the Majlis al-Shura out of 120 members.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

The Government disagreed with internationally accepted definitions of human rights and viewed its interpretation of Islamic law as the only necessary guide to protect human rights. In January, a team from HRW visited the country, the first ever visit by an independent human rights group. The visit received wide publicity in the national press, and the team met with senior Government officials.

In January, a citizen formerly imprisoned for his political views announced at a press conference in Riyadh the establishment of a human rights NGO called Human Rights First – the Society for Protecting and Defending Human Rights in the Kingdom of Saudi Arabia. The citizen did this in spite of his failure to receive a response from the Government to his request for recognition as an NGO.

In May, the Government announced that it had approved the creation of the first independent human rights monitoring organization.

Section 5 Discrimination Based on Race, Sex, Disability, Language, or Social Status

There was legal and systemic discrimination based on gender. The law prohibits discrimination based on race, but not nationality, although such discrimination occurs. The Government and private organizations cooperated in providing services for persons with disabilities; however, there is no legislation mandating public access. The Shi'a minority suffered social, legal, economic, and political discrimination (see Section 2.c.). Unlike in previous years, there were no reports that religious police arrested or punished men for engaging in homosexual activity.

The press reported that approximately 1,500 citizens are infected with HIV/AIDS (approximately 23 percent are women). The press reported that the most common form of contracting the disease is through sexual intercourse; however, the article mentions the transfer through needle sharing and the treatment of "Hijwah." "Hijwah" is a superstitious medical practice in society that withdraws "bad blood" that may contain illnesses. The article also focused on the social stigma surrounding AIDS and the lack of public education on the issue. At year's end, the Ministry of Health began producing brochures on the illness and started group therapy and awareness programs.

Women

In May, the King's speech to the Majlis al-Shura called for expanding the role of women in society, and in June, the National Dialogue conference endorsed the principle that there should be an expansion of women's role, in addition to reexamining restrictions imposed by custom or tradition rather than Islam. In December, the National Dialogue held its second session and 10 women participated for the first time.

There were several developments related to women's participation in business, including the opening by the Saudi Arabian General Investment Authority (SAGIA) of an all-female investment center in Riyadh to facilitate investment in local businesses by citizen and foreign women. For the first time, the Jeddah Economic Forum devoted an entire day to discussing the role of women in domestic and international business.

During the year, there was increased attention in the press to women's issues, including questions such as gender discrimination health, rising divorce rates, employment, driving, and legal problems women face doing business. With the Government's announcement that they plan to hold municipal elections, there has been intense speculation over the extent to which women would be allowed to participate. Following terrorist attacks in November, a female citizen drove a number of injured males to a nearby hospital for emergency medical treatment, prompting a national debate on the rights of women to drive.

Shari'a prohibits abuse and violence against all innocent persons, including women; although the Government did not keep statistics on spousal abuse or other forms of violence against women, based on the information available regarding physical spousal abuse and violence against women, such violence

and abuse appeared to be common problems. Hospital workers reported that many women were admitted for treatment of injuries that apparently resulted from spousal violence; hospitals now are required to report any suspicious injuries to authorities. A citizen may prevent his wife and any child or unmarried adult daughter from obtaining an exit visa to depart the country, regardless of nationality (see Section 2.d.).

Foreign embassies continued to receive many reports that employers abused foreign women working as domestic servants. Some embassies of countries with large domestic servant populations maintained safehouses to which their citizens may flee to escape work situations that included forced confinement, withholding of food, beating and other physical abuse, and rape. Often the reported abuse is at the hands of female citizens. During the year, the media reported more frequently on cases involving domestic abuse of women, servants, and children. However, in general the Government considered such cases to be family matters and did not intervene unless charges of abuse were brought to its attention. It was almost impossible for foreign women to obtain redress in the courts due to the courts' strict evidentiary rules and the women and servants' own fears of reprisals. During the year, there were increasing reports of employers being punished for abuse of domestic servants.

By religious law and social custom, women have the right to own property and are entitled to financial support from their husbands or male relatives. However, women have few political or social rights and are not treated as equal members of society. There were no active women's rights groups. Women may not legally drive motor vehicles and are restricted in their use of public facilities when men are present. Women must enter city buses by separate rear entrances and sit in specially designated sections. Women risked arrest by the Mutawwa'in for riding in a vehicle driven by a male who was not an employee or a close male relative. The law provides that women may not be admitted to a hospital for medical treatment without the consent of a male relative; however this was not generally enforced. By law and custom, women may not undertake domestic or foreign travel alone (see Section 2.d.). During the year, the Government began again to issue national identity cards to females, despite a national campaign by some religious conservatives against it. In public, a woman was expected to wear an abaya (a black garment that covers the entire body) and also to cover her head and hair. The Mutawwa'in generally expected Muslim women to cover their faces, and women from other countries in Asia and Africa to comply more fully with local customs of dress than they do non-Muslim Western women; nonetheless, in recent years they have instructed Western women to wear the abaya and cover their hair. During the year, Mutawwa'in continued to admonish and harass women to wear their abayas and cover their hair. In one case, a Mutawwa sexually assaulted a female expatriate, and there was no evidence that he received any punishment.

There were some restrictions placed on accredited female diplomats that did not apply to their male counterparts. For example, single females must receive exception letters from their respective embassies in order to stay at a hotel, and some social functions were restricted to male or female participants only.

Women also were subject to discrimination under Shari'a as interpreted in the country, which stipulates that daughters receive half the inheritance awarded to their brothers. While Shari'a provides women with a basis to own and dispose of property independently, women often are constrained from asserting such rights because of various legal and societal barriers, especially regarding employment and freedom of movement. In a Shari'a court, the testimony of one man equals that of two women (see Section 1.e.). Although Islamic law permits polygyny, with up to four wives, it is becoming less common due to demographic and economic changes. Islamic law enjoins a man to treat each wife equally. In practice such equality is left to the discretion of the husband. Some women participated in Al-Mesyar (or "short daytime visit") marriages, or what are described as "weekend marriages," in which the women relinquished their legal rights to financial support and nighttime cohabitation. Additionally, the husband was not required to inform his other wives of the marriage, and any children resulting from such a marriage have no inheritance rights. The Government placed greater restrictions on women than on men regarding marriage to noncitizens and non-Muslims (see Section 1.f.).

Women must demonstrate legally specified grounds for divorce, but men may divorce without giving cause. In doing so, men were required to pay immediately an amount of money agreed upon at the time of the marriage, which serves as a one-time alimony payment. Women who demonstrate legal grounds for divorce still were entitled to this alimony. If divorced or widowed, a Muslim woman normally may keep her children until they attain a specified age: 7 years for boys; and 9 years for girls. Children over these ages are awarded to the divorced husband or the deceased husband's family. Numerous divorced foreign women continued to be prevented by their former husbands from visiting their children after divorce.

Women had access to free but segregated education through the university level. They constituted more than 58 percent of all university students, but were excluded from studying such subjects as engineering, journalism, and architecture. Men may study overseas; the law provides that women may do so only if

accompanied by a spouse or an immediate male relative. However, this restriction was not enforced in practice.

Women made up approximately 14.6 percent of the formal citizen work force. Unemployment among women was approximately 15.8 percent. Citizen women reportedly owned approximately 20 percent of the businesses, although they must deputize a male relative to represent them in financial transactions. Most employment opportunities for women were in education and health care. Despite limited educational opportunities in many professional fields, some female citizens were able to study abroad and return to work in professions such as architecture, law and journalism. Many foreign women worked as domestic servants and nurses.

Women who wished to enter nontraditional fields were subject to discrimination. Women may not accept jobs in rural areas if there are no adult male kin present with whom they may reside and who agree to take responsibility for them. Most workplaces in which women were present are segregated by gender. Frequently, contact with male supervisors or clients was allowed only by telephone or fax machine. However, the degree of segregation varies by region, with the central region having the most restrictions, and the eastern and western regions being more relaxed. According to the Ministry of Commerce, women were not eligible to be issued business licenses for work in fields that might require them to supervise foreign workers, interact with male clients, or deal on a regular basis with government officials. However, in hospital settings and in the energy industry, women and men worked together, and, in some instances, women supervised male employees. Some women and men continued to seek opportunities for women and to break down gender segregation.

Prostitution is illegal. Some women were trafficked to Saudi Arabia for the purpose of prostitution; however, the problem is not widespread.

Children

The Ministry of Education has implemented a program to teach children their rights under the UN Convention on the Rights of Children. They have given teachers large posters describing the rights that have been placed in classes, and have begun to distribute booklets to the students on the Convention.
The Government provided all children with free education and medical care. Children were not subject to the strict social segregation faced by women although they were segregated by sex in schools, beginning at the age of 7; however, schools were integrated through the fourth grade in some areas. By age 9, most children were segregated by sex in school. In more general social situations, boys were segregated at the age of 12 and girls at the onset of puberty. According to the United Nations Development Programme (UNDP), in 2000-01, net primary enrollment was 58 percent and in 1999-2000, 94 percent of enrolled children reached grade 5.

Abuse of children was a problem, although it was difficult to gauge the prevalence of child abuse, since the Government keeps no national statistics on such cases. Although in general the culture greatly prizes children, studies by citizen female doctors indicated that severe abuse and neglect of children appeared to be more widespread than previously reported. The press has also played an important role in beginning to raise national consciousness about the widespread problem.

In December, the Ministry of Interior's Center for Crime Prevention and Research reported that 21 percent of male children suffered from some form of abuse in the county. The report stated that of the abused, 33.6 percent suffered from some sort of psychological abuse and 25.3 percent suffered physical abuse. The figures excluded female children and accusations of sexual abuse, as the Ministry stated that the issues were too sensitive for public discussion.

Trafficking in children for forced begging persisted (see Sections 6.c. and 6.f.).

Persons with Disabilities

The law provides hiring quotas for persons with disabilities. There is no legislation that mandates public accessibility; however, newer commercial buildings often include such access, as do some newer government buildings. The provision of government social services increasingly has brought persons with disabilities into the public mainstream. The Government and private charitable organizations cooperated in education, employment, and other services for persons with disabilities.

During the year the Government took a variety of steps promoting more rights and elimination of discrimination against persons with disabilities. A 2002 study found that there were 493,605 persons with disabilities in the country. Of that number, representing 4 percent of the population, 34 percent have some

form of body disabilities and 30 percent have sight disabilities. The Government established an endowment committee for children with disabilities, and a supreme council to deal with the affairs of the disabled with the Crown Prince as chairman. Foreign criminal rings reportedly bought and imported children with disabilities for the purpose of forced begging (see Sections 6.c. and 6.f.).

Police generally transported persons with mental disabilities found wandering alone in public to their families or a hospital. Police claimed that according to Islam, family members should be taking care of such individuals.

On December 13, the Crown Prince inaugurated a Festival for the Handicapped. The Government stated that the 86,000 disabled citizens in the country receive a total of $80 million (300 million Riyals) from the Government.

National/Racial/Ethnic Minorities

Although racial discrimination is illegal, there was substantial societal prejudice based on ethnic or national origin. Foreign workers from Africa and Asia were subject to various forms of formal and informal discrimination and have the most difficulty in obtaining justice for their grievances. For example, pay scales for identical or similar labor or professional services were set by nationality such that two similarly qualified and experienced foreign nationals performing the same employment duties receive varied compensation based on their nationalities.

In late 2002, Crown Prince Abdullah called for a national strategy to eliminate poverty, and the Ministry of Labor and Social Affairs established an Anti-Poverty Fund. The Press continued to highlight this problem, including the publication of a Government study showing that it will take 30 years to reduce poverty to 2.5 percent in the country if the Government spends a little over $53 million (200 million Riyal) on human services.

Section 6 Worker Rights

a. The Right of Association

The law does not address freedom of association. The Government prohibited the establishment of labor unions; however, since 2001 the Government has permitted the establishment of labor committees for citizens in local companies, including factories, having more than 100 employees. The aim is to facilitate communication between employees and employers and the improvement of work standards in the workplace. The labor committees consist of 3 to 9 members who would serve 3-year terms. The committee members are chosen by the workers and approved by the Ministry. The committee may make recommendations to company management to improve work conditions, increase productivity, improve health and safety, and recommend training programs. The Ministry of Labor and Social Affairs may send a representative to attend committee meetings. A committee must provide a written report of its meetings to company management, which also will be transmitted to the Ministry. The Ministry may dissolve a labor committee if it violates regulations or threatens public security. No committees existed by year's end. Foreign workers may not serve on the committee; however, committee regulations provide that the committee should represent their views.

b. The Right to Organize and Bargain Collectively

The Law does not provide for collective bargaining. Collective bargaining was prohibited. Foreign workers comprised approximately two-thirds of the work force. There was no minimum wage; wages were set by employers and varied according to the type of work performed and the nationality of the worker (see Section 5).

Strikes were prohibited; however, there were several cases in which factory workers in Jeddah staged strikes to protest unpaid wages. The press reported in September that over 500 foreign workers had not been paid for 18 months, nor had they had their residents permits renewed. In 1995, the U.S. Overseas Private Investment Corporation suspended coverage because of the Government's lack of compliance with internationally recognized worker rights standards.

There are no export processing zones.

c. Prohibition of Forced or Bonded Labor

The law prohibits forced or bonded labor. Ratification of the International Labor Organization (ILO)

Conventions 29 and 105, which prohibit forced labor, gives them the force of law. However, employers had significant control over the movements of foreign employees, which gave rise to situations that sometimes involved forced labor, especially in remote areas where workers were unable to leave their place of work.

The law does not prohibit specifically forced or bonded labor by children, but it was not a problem, with the rare exception of forced child begging rings, and possibly family businesses

In 2002 the Ministry of Interior reported that the government system of sponsorship of expatriate workers has come under national scrutiny. However, the Minister said the Government is not yet ready to abrogate the current system of sponsorship until it has been fully studied and a better system for controlling the expatriate labor force had been presented and accepted.

Some sponsors prevented foreign workers from obtaining exit visas to pressure them to sign a new work contract or to drop claims against their employers for unpaid salary (see Section 2.d.). Additionally, some sponsors refused to provide foreign workers with a "letter of no objection" that would allow them to be employed by another sponsor.

There were many reports of workers whose employers refused to pay several months, or even years, of accumulated salary or other promised benefits. More foreign workers than in the past are going to labor courts, which regularly rule in favor of the workers. However, this is a long and difficult process and it is difficult to enforce judgments. The labor system was conducive to the exploitation of foreign workers because enforcement of work contracts was difficult and generally favors employers. Labor courts, while generally fair, may take many months to reach a final appellate ruling, during which time the employer may prevent the foreign laborer from leaving the country. An employer also may delay a case until a worker's funds are exhausted, and the worker is forced to return to his home country.

d. Status of Child Labor Practices and Minimum Age for Employment

The minimum age for employment is 13 years, which may be waived by the Ministry of Labor with the consent of the juvenile's guardian. There is no minimum age for workers employed in family-oriented businesses or in other areas that are construed as extensions of the household, such as farming, herding, and domestic service.

Children under the age of 18 may not be employed in hazardous or harmful industries, such as mining or industries employing power-operated machinery. While there is no formal government entity responsible for enforcing the minimum age for employment of children, the Ministry of Justice has jurisdiction and has acted as plaintiff in the few cases that have arisen against alleged violators. However, in general children played a minimal role in the work force.

The majority of child beggars are citizens, many of them girls with disabilities, according to an ILO study reported in 2002. The Ministry has maintains special offices in both Mecca and Medina to combat the growing problem of child beggars.

The law does not prohibit specifically forced or bonded labor by children, but it was not a problem, with the rare exception of forced child begging rings, and possibly family businesses (see Section 6.c.). The Government implemented a regulation requiring that all camel jockeys be at least 18 years of age, and there are indications that this is in force.

e. Acceptable Conditions of Work

There is no legal minimum wage. Labor regulations establish a 48-hour workweek at regular pay and allow employers to require up to 12 additional hours of overtime at time-and-a-half pay. Labor law provides for a 24-hour rest period, normally on Fridays, although the employer may grant it on another day. The average wage generally provides a decent standard of living for a worker and family. Official unemployment numbers vary; however, the Riyadh Chamber of Commerce and Industry announced that as of October, unemployment among 15-29 year olds was 17 percent of men and 30 percent of women. They also stated that unemployment within the citizen population is expected to reach 30 percent within 3 years if current trends hold.

The ILO has stated that the Government did not formulate legislation implementing the ILO Convention 100 on Equal Remuneration and that regulations that segregated work places by sex or limit vocational programs for women violated ILO Convention 111 on Discrimination in Employment and Occupation.

In 2002, the Government passed a law prohibiting employers from holding their employees' passports

without the employee's consent. However, this law is not widely known throughout the country.

Workers risked losing employment if they remove themselves from hazardous work conditions.

Labor regulations require employers to protect most workers from job-related hazards and disease. However, foreign nationals reported frequent failures to enforce health and safety standards. Farmers, herdsmen, domestic servants, and workers in family-operated businesses were not covered by these regulations.

Some foreign nationals who have been recruited abroad have claimed that after their arrival in the country, they were presented with work contracts that specified lower wages and fewer benefits than originally promised. Other foreign workers reportedly have signed contracts in their home countries and later were pressured to sign less favorable contracts upon arrival. Some employees reported that at the end of their contract service, their employers refused to grant permission to allow them to return home. Foreign employees involved in disputes with their employers may find their freedom of movement restricted (see Section 2.d.). The labor laws, including those designed to limit working hours and regulate working conditions, do not apply to foreign domestic servants, and such domestic servants may not seek the protection of the labor courts. There were credible reports that female domestic servants sometimes were forced to work 16 to 20 hours per day, 7 days per week. There were numerous confirmed reports of maids fleeing employers and seeking refuge in their embassies or consulates (see Section 5). Foreign embassies continued to receive reports of employers abusing domestic servants. Such abuse included withholding of food, beatings and other physical abuse, and rape (see Section 5). During the year, the media continued to report stories of maids who had fled their place of employment.

The Government has instituted welfare shelters to house female domestic servants who flee their place of work. The Government offers arbitration between the worker and employer and investigates allegations of abuse. If no agreement can be reached, the maid is deported to her home country. In at least two publicized cases during the year, citizen employers were jailed for extreme abuse of domestic servants. During the year, the Grand Mufti warned citizens that Islam does not permit the oppression of workers regardless of their religion.

The ongoing campaign to remove illegal immigrants from the country has done little to Saudiize the economy because illegal immigrants largely worked in low-income positions, which most citizens considered unsuitable. The Government carried out the campaign by widely publicizing its enforcement of existing laws against illegal immigrants and citizens employing or sponsoring illegal immigrants.

The effect of the expeditious repatriation during the year of some illegal immigrants and the legalization of others has been to improve overall working conditions for legally employed foreigners. Illegal immigrants generally were willing to accept lower salaries and fewer benefits than legally employed immigrants. The departure or legalization of illegal workers reduced the competition for certain jobs and thereby reduced the incentive for legal immigrants to accept lower wages and fewer benefits as a means of competing with illegal immigrants. Furthermore, their departure or legalization removed a large portion of the class of workers most vulnerable to abuse and exploitation because of their illegal status.

f. Trafficking in Persons

The law does not prohibit specifically trafficking in persons; however, the law prohibits slavery and the smuggling of persons into the country and there were unconfirmed reports that women were trafficked into the country to work as prostitutes. In 2002, the Government approved two international protocols on trafficking in persons, one that combats the smuggling of immigrants by land, sea, or air and the other that seeks to prevent trade in persons, especially women and children.

Among the millions of foreign workers in the country, some persons, particularly domestic workers, were defrauded by employment agencies or exploited by employers; some workers overstay their contracts and are exploited as they have few legal protections. Many foreign domestic servants fled work situations that included forced confinement, beating and other physical abuse, withholding of food, and rape. Police academies have a course for new officers on how to handle labor issues as part of their standard curriculum.

During the year, the Government acknowledged trafficking problems in terms of abuse of domestic servants, especially female expatriate workers. The press carried a number of stories on the abuse of maids and other domestic workers, including the prosecution and punishment of citizen employers who abused domestic employees. The media campaign appeared to be an effort to begin raising national awareness about the problem. During the year, the Ministry of Labor formed an internal committee that

was preparing an educational program to advise foreign domestic workers of their rights for recourse to authorities if they experience abuse or nonpayment of wages.

In 2002, the Government ordered that all private recruitment offices must adopt a standard commitment contract in their private dealings with foreign recruiters sending labor to the country. The purpose of the contract, which was implemented during the year, is to prevent false promises and abuses by recruitment offices. It was not yet clear whether this contract is achieving its intended results. During the year, the Government granted the Ministry of Labor and Social Affairs full responsibility for the issuance of work visas to expatriates in an effort to eliminate abuse of visa procedures by sponsors.