IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABDALHADI M. AL-SOPAI, et al.,[1]

Petitioner,

v.

GEORGE W. BUSH, et al.,

Respondents.

Civil Action No. 05-1667 (RBW)

RESPONDENTS' OPPOSITION TO PETITIONER'S
MOTION FOR ORDER REGARDING NOTICE OF TRANSFER

Respondents respectfully submit this memorandum in opposition to petitioner's "motion

for order regarding notice of transfer" (dkt. no. 7).  While petitioner is careful to avoid labeling

his request as one for a preliminary injunction, petitioner's motion, in sum and substance,

presents the precise issue that this Court has previously ruled on in Almurbati v. Bush, 366 F.

Supp. 2d 72 (D.D.C. 2005), and Battayav v. Bush, Civ. A. No. 05-714 (RBW) (May 3, 2005).

Petitioner's motion should be denied because it fails to establish a factual or legal basis for the

relief sought.[2]

_____

[1] Petitioner has filed a motion to change the caption to reflect a corrected spelling of
petitioner's name (dkt. no. 4).  Respondents do not oppose modification of the caption, but to
avoid unnecessary confusion, respondents continue to use the original caption until the motion is
granted and the Court's docket is amended to formally reflect the change.

[2] Similar motions have been filed over the past nine months in numerous other
Guantanamo detainee habeas cases, with varying results.  Compare, e.g., El-Mashad v. Bush,
Civ. A. No. 05-270 (JR), Order dated April 7, 2005 ( prohibiting transfer or release as part of stay
of proceedings); Abdah v. Bush, Civ. A. No. 04-1254 (HHK), 2005 WL 711814 (D.D.C. Mar.
29, 2005) (granting preliminary injunction), with Kurnaz v. Bush, Civ. A. No. 04-1135 (ESH),
2005 WL 839542 (D.D.C. Apr. 12, 2005) (granting preliminary injunction only as to transfers
other than for release), with Al-Oshan v. Bush, Civ. A. No. 05-520 (RMU) (D.D.C. Mar. 31,
2005) (ordering advance notice as part of stay), with Deghayes v. Bush, Civ. A. No. 04-2215
(continued...)

## BACKGROUND

### A.    Detention of Enemy Combatants at Guantanamo

Following the terrorist attacks of September 11, 2001, pursuant to his powers as

Commander in Chief and with congressional authorization, see Authorization for Use of Military

Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), the President dispatched the United States

Armed Forces to seek out and subdue the al Qaeda terrorist network and the Taliban regime and

others that had supported it.  In the course of those hostilities, the United States has captured or

taken custody of a number of foreign nationals as enemy combatants, some of whom are being

held at the Guantanamo Bay Naval Base ("Guantanamo") in Cuba.

### B.    Repatriation and Transfer of Enemy Combatant Detainees at Guantanamo

Although the laws of war permit the United States to hold enemy combatants in detention

for the duration of hostilities, the United States has no interest in detaining any individuals longer

than necessary.  See Declaration of Deputy Assistant Secretary of Defense for Detainee Affairs

Matthew C. Waxman dated June 2, 2005 ("Waxman Decl.") ¶ 3; Declaration of Ambassador

Pierre-Richard Prosper dated March 8, 2005 ("Prosper Decl.") ¶ 2.[3]  The Department of Defense

---

[2](...continued)
(RMC) (D.D.C. June 15, 2005) (denying preliminary injunction but requiring notice to the Court
of any decision to transfer a particular individual to a particular country), with Almurbati v.
Bush, 366 F. Supp. 2d 72 (D.D.C. 2005) (denying preliminary injunction); Al-Anazi v. Bush,
370 F. Supp. 2d 188 (D.D.C. 2005) (same); Mammar v. Bush, Civ. A. No. 05-573 (RJL), slip op.
(D.D.C. May 2, 2005) (same); Attash v. Bush, Civ. A. No. 05-1592 (RCL), slip op. (D.D.C. Sept.
1, 2005) (same).  Respondents have taken interlocutory appeals of the orders requiring advance
notice.  No order denying advance notice has been appealed.

[3] The June 2, 2005 Waxman Declaration submitted herewith replaces and supersedes two
prior declarations by Deputy Assistant Secretary Waxman submitted in connection with similar
motions in other Guantanamo detainee cases.  See Waxman Decl. ¶ 1.  The Prosper Declaration
(continued...)

("DoD") conducts at least annual reviews of each Guantanamo detainee to determine whether continued detention is warranted based on factors such as whether the detainee continues to pose a threat to the United States and its allies.  Waxman Decl. ¶¶ 3, 7; Prosper Decl. ¶ 2.  Those annual reviews include those currently being conducted through Administrative Review Boards.  See Waxman Decl. ¶¶ 3, 7.[4]  As part of the Administrative Review Board process, counsel who represent detainees have been invited to make written submissions concerning whether further detention is appropriate; in these submissions, counsel are free to raise, and in fact have raised, any concerns about transfer or repatriation, and have in fact made such submissions.

Following consultation with various agencies, a senior Department of Defense official grants the ultimate approval for the transfer of any Guantanamo detainee to the control of another government.  Waxman Decl. ¶¶ 6-7; Prosper Decl. ¶¶ 2-3, 7.  Almost 250 Guantanamo detainees have been so transferred, over a period spanning several years.  Waxman Decl. ¶ 4; Prosper Decl. ¶ 2.[5]

---

[3](...continued)
submitted herewith was originally submitted in connection with a similar motion in Abdah, Civ. A. No. 04-1254 (HHK), and Ambassador Prosper left office on or about October 11, 2005, but the policies and practices set forth in his March 8 declaration remain in effect and are applicable to the instant case.  Certain numerical information in the declarations is subject to updating.  See infra note 5.

[4]  See generally Memorandum of the Deputy Secretary of Defense dated May 11, 2004, re: Administrative Review Procedures for Enemy Combatants in the Control of the Department of Defense at Guantanamo Bay Naval Base, Cuba, available at <<http://www.defenselink.mil/news/May2004/d20040518gtmoreview.pdf>>; Memorandum dated September 14, 2004, re: Implementation of Administrative Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, available at <<http://www.defenselink.mil/news/Sep2004/ d20040914adminreview.pdf>>.

[5]  As an update to certain information provided in the attached declarations, at last count,
(continued...)

Where continued detention by the United States is not warranted, a detainee may be transferred to the control of another government, typically the government of his country of citizenship, for release.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.  The United States also transfers Guantanamo detainees, under appropriate circumstances, to the control of other governments for continued detention, investigation, and/or possible prosecution when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not pose a threat to the United States and its allies.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.  Such governments can include the government of a detainee's country of citizenship, or another country that may have law enforcement, prosecution, or other interest in the detainee.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.

Such transfers to the control of other governments for continued detention, investigation, and/or prosecution occur after a dialogue between the United States and the receiving government, which may have been initiated by either the United States or the receiving government.  Waxman Decl. ¶ 5.  The purpose of such dialogue is to ascertain or establish what measures the receiving government intends to take, pursuant to its own domestic laws and independent determinations, that will ensure that the detainee will not pose a continuing threat to the United States and its allies.  Id.  In all cases where a transfer is consummated, the detainee is transferred entirely to the custody and control of the other government; once transferred, the individual is no longer in the custody or control of the United States.  Id.  Any future detention of

---

[5](...continued)
256 detainees have been transferred by the Defense Department from Guantanamo, of which 180 were transferred for release.  See Department of Defense Press Release, "Detainee Transfer Announced," Nov. 5, 2005, available at <<http://www.defenselink.mil/releases/>>.

that individual is by the foreign government pursuant to its own laws and not on behalf of the United States.  Id.  In fact, most of the Guantanamo detainees who have been transferred by the Department of Defense to the control of their home countries for continued detention, investigation, and/or prosecution have been released from detention some time after the transfer. Id.

In any transfer, a key concern is whether the foreign government will treat the detainee humanely and in a manner consistent with its international obligations.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6-7.  It is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.  If a transfer is deemed appropriate, a process is undertaken, typically involving the Department of State, in which appropriate assurances regarding the detainee's treatment are sought from the country to whom the transfer of the detainee is proposed.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 5.  Once the Department of Defense approves a transfer and requests the assistance of the Department of State, the Department of State initiates transfer discussions with the foreign government concerned.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 6.  Such discussions include an effort to seek assurances that the United States Government considers necessary and appropriate for the country in question, including assurances of humane treatment and treatment in accordance with the international obligations of the foreign government accepting transfer.  Id.  Among other things, the Department of State considers whether the nation in question is a party to relevant treaties such as the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and pursues more specific assurances if the nation concerned is not a party or other circumstances warrant.

Id.

The determination whether it is more likely than not an individual would be tortured by a receiving foreign government, including, where applicable, evaluation of foreign government assurances, involves senior level officials and takes into account a number of considerations, including whether the nation concerned is a party to certain treaties; the expressed commitments of officials of the foreign government accepting transfer; the particular circumstances of the transfer, the country, and the individual concerned; and any concerns regarding torture that may arise. Prosper Decl. ¶¶ 6-8; Waxman Decl. ¶ 7. Recommendations by the State Department are developed through a process involving the Bureau of Democracy, Human Rights, and Labor (which drafts the State Department's annual Country Reports on Human Rights Practices) and the relevant State Department regional bureau, country desk, or U.S. Embassy. Prosper Decl. ¶ 7. When evaluating the adequacy of assurances, State Department officials consider the identity, position, or other information concerning the official relaying the assurances; political or legal developments in the foreign country concerned that provide context for the assurances; and the foreign government's incentives and capacity to fulfill its assurances to the United States. Prosper Decl. ¶ 8. In an appropriate case, the State Department may consider various monitoring mechanisms for verifying that assurances are being honored. Id. If a case were to arise in which the assurances obtained from the receiving government were not sufficient when balanced against treatment concerns, the United States would not transfer a detainee to the control of that government unless the concerns were satisfactorily resolved. Waxman Decl. ¶ 7; Prosper Decl. ¶ 8. Indeed, circumstances have arisen in the past where the Department of Defense decided not to transfer detainees to their country of origin because of mistreatment concerns. Waxman Decl.

¶ 7; Prosper Decl. ¶ 8.

The United States' ability to seek and obtain assurances from a foreign government depends on its ability to treat its dealings with the foreign government with discretion. Prosper Decl. ¶ 9; Waxman Decl. ¶ 8. Obviously, diplomatic sensitivities surround the Department of State's communications with foreign governments concerning allegations relating to torture. Prosper Decl. ¶ 9; Waxman Decl. ¶ 8. The United States Government typically does not unilaterally make public any specific assurances or other precautionary measures obtained, because such disclosure would have a chilling effect on and cause damage to our ability to conduct foreign relations. Prosper Decl. ¶ 9. If the United States Government were required to disclose its communications with a foreign government relating to particular mistreatment or torture concerns outside appropriate Executive Branch channels, that government and potentially other governments would likely be reluctant to communicate frankly with the United States concerning such issues in the future.[6] Prosper Decl. ¶¶ 9-10; Waxman Decl. ¶ 8. As a result, disclosure could impede our country's ability to obtain vital cooperation from concerned governments with respect to military, law enforcement, and intelligence efforts related to the war on terrorism. Waxman Decl. ¶ 8; Prosper Decl. ¶ 12.

---

[6] Another reason such disclosure would be harmful is that the State Department's recommendation concerning transfer relies heavily on facts and analyses provided by Embassies and other State Department offices, and confidentiality is necessary to ensure that the advice and analysis provided by those offices are useful and informative for the decision-maker. Prosper Decl. ¶ 11. Disclosure of their assessments could chill important sources of information and interfere with the ability of our foreign relations personnel to interact effectively with foreign state officials. Id.

## ARGUMENT

## I.     LEGAL STANDARD

### A.     Notwithstanding the Label, Petitioner's Motion Seeks Injunctive-Type Relief

Even though he asks the Court to grant relief that is clearly injunctive in nature, petitioner avoids any mention of the analytical framework and standards governing preliminary injunctions.[7]  Instead, he asks the Court to ground the injunction in "the Court's inherent authority to impose reasonable conditions to a stay of proceedings."  Petr's Mem. at 1.

Even petitioner's own papers, however, do not bear out the fiction that the relief petitioner is seeking is anything other than a preliminary injunction.  Most importantly, the operative language of the proposed order submitted by petitioner is clearly injunctive in character.  See [Draft] Order Regarding Notice of Transfer ("ORDERED that Respondents . . . SHALL" provide advance notice of any future transfer of petitioner).  The language specifying who would be bound by the proposed injunction appears to be borrowed from Federal Rule of Civil Procedure 65, "Injunctions."  Compare [Draft] Order Regarding Notice of Transfer ("Respondents, their agents, servants, employees, confederates, and any persons acting in concert or participation with them, or having actual of [sic] implicit knowledge of this Order by personal service or otherwise"), with Fed. R. Civ. P. 65(d) ("parties to the action, their officers, agents,

---

[7]  Interestingly, as noted in petitioner's motion at paragraph 2, petitioner's counsel contemporaneously filed motions seeking the same relief as is sought herein in cases brought on behalf of three other Guantanamo detainees.  See Al-Bahooth v. Bush, Civ. A. No. 05-1666 (ESH); Al-Uwaidah v. Bush, Civ. A. No. 05-1668 (GK); Algatele v. Bush, Civ. A. No. 05-1669 (TFH).  In each of those other three cases, petitioners are explicit that what they are seeking is a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure.  It is only in this case that petitioner attempts to package what is being sought as something other than an injunction.

servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise").  And, while petitioner recasts the requested injunction as simply a modest "condition to a stay of proceedings," the proposed order does not reflect any such limitation: while the stay respondents have requested would be a temporary stay pending resolution of all appeals (see dkt. no. 3), petitioner's proposed injunction transcends the requested stay pending related appeals and, like a standard preliminary injunction, would "remain in effect until the final resolution of Petitioner's habeas claim unless otherwise modified or dissolved." See [Draft] Order Regarding Notice of Transfer.  The relief petitioner requests herein bears the same hallmarks of injunctive relief as does the relief explicitly styled as a preliminary injunction that counsel is seeking on behalf of petitioners in other cases.

"Federal district courts, as courts of limited jurisdiction, possess only such authority as is conferred to them by the Constitution and acts of Congress, and this authority cannot be expanded by judicial decree." Almurbati v. Bush, 366 F. Supp. 2d 72, 74 (2005) (internal quotation marks omitted).  Petitioner's ploy to have the Court bypass the standards and limitations governing the "extraordinary and drastic remedy" (Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S. Ct. 1865, 1867 (1997)) of injunctive relief in the federal courts should be rejected.  As another Judge of this Court concluded in declining a similar invitation to order advance notice as a condition of a stay, "if the petitioners cannot meet the prerequisites of a motion for preliminary injunction . . . it is unlikely that they should receive that same relief through the backdoor of a stay." Al-Anazi, 370 F. Supp. 2d at 199 n.11 (citing Laborers' Intern. Union of North Am. v. Nat'l Post Office Mail Handlers, 1988 WL 142384, at *1 (D.D.C. Dec.

23, 1988)).  Petitioner surmises that "[t]he petitioners [in Al-Anazi] apparently did not request advance notice as a condition of granting the stay," Petr's Mem. at 7, but apparently overlooks the Al-Anazi Court's plain statement that "[p]etitioners have suggested that this Court could make the 30-day notice of a proposed transfer a condition of the stay it is issuing in this case," before the Court went on to reject that suggestion.  370 F. Supp. 2d at 199 n.11.

Similarly, this Court previously looked beyond the label placed on a request for relief and analyzed it according to its true injunctive character in Battayav v. Bush, Civ. A. No. 05-714 (May 19, 2005) (dkt. no. 12 in Battayav), when the petitioner in that case requested that a stay pending related appeals be conditioned upon an order mandating advance notice of Administrative Review Board proceedings.  As here, "the petitioners simply make this request, but fail to provide any legal support for it."  Id. at 4.  This Court reasoned that "this request is in effect a motion for a preliminary injunction," and therefore held petitioners to their burden of "show[ing] that they satisfy the criteria for obtaining injunctive relief."  Id. at 4-5.

The same is true here.  As this Court previously held in Battayav and Judge Bates held in Al-Anazi, in whatever form of order the inherently-injunctive-in-nature relief petitioner seeks might be embodied, petitioner should be required to satisfy the preliminary injunction standard in order to justify that relief.  The fact that petitioner has not even attempted to do so is sufficient reason, in and of itself, to deny the instant motion.

### B.     Preliminary Injunction Standard

It is well-established that a request for preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  Mazurek v. Armstrong, 520 U.S. at 972, 117 S. Ct. at 1867; Cobell v.

Norton, 391 F.3d 251, 258 (D.C. Cir. 2004).  To prevail in a request for a preliminary injunction, a movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.'"  See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).

In particular, the irreparable harm that must be shown to justify a preliminary injunction "must be both certain and great; it must be actual and not theoretical."  Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).  "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time; the party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."  Id. (citations and internal quotation marks omitted; emphasis in original).

## II.  PETITIONER FAILS TO SHOW IRREPARABLE INJURY

### A.  The Mooting of a Habeas Claim that Naturally Flows From Relinquishment of United States Custody Does Not Constitute Irreparable Injury Justifying a Preliminary Injunction

Some Judges of this Court have required advance notice of any transfer through a preliminary injunction or otherwise in order to "protect" or "preserve" the Court's jurisdiction, reasoning that a transfer would or could extinguish the transferred detainee's habeas claims and curtail the Court's review of the legality of his detention.  Respondents respectfully suggest that these decisions rest on faulty logic.  The ultimate relief sought by petitioner in this habeas case is obviously release from custody.  Any right to challenge the legality of one's detention through a

habeas proceeding cannot reasonably extend so far as to require that detention be continued, after

the Executive determines that the military rationales for enemy combatant detention no longer

warrant such custody, for no reason other than to be able to test the legitimacy of detention the

Executive no longer is interested in maintaining.[8]  "The ultimate objective of a habeas petition is

release from custody."  Almurbati, 366 F. Supp. 2d at 78.  As this Court previously stated, "once

the respondents release the petitioners from United States custody . . . they will have obtained the

result requested and at that point there will be no further need for this Court to maintain

jurisdiction."  Id. at 80; see also Al-Anazi, 370 F. Supp. 2d at 198 ("Every habeas petition,

including this one, is ultimately about obtaining release from detention, and where, as here, the

United States will relinquish custody of the detainee to the home government there is nothing

more the Court could provide to petitioners." (citation omitted)).

    That release from United States custody will give petitioner all the relief he can seek

through habeas is not altered by the fact that, upon being released from the custody of the United

States, a former detainee may be taken into custody and detained in the receiving country based

on that country's independent interests and determinations.  As respondents' declarations make

---

[8] Transfers of Guantanamo detainees are not undertaken in order to thwart the jurisdiction of the Court.  Waxman Decl. ¶ 3.  Indeed, such transfers have been occurring since October 2002, long before the June 28, 2004 Rasul Supreme Court decision and the proliferation of detainee habeas petitions that it spawned in this Court.  Waxman Decl. ¶ 4.  As a Judge of this Court previously noted, 131 transfers (i.e., more than half of the transfers to date) had occurred three months or longer before Rasul was decided, "thus casting doubt on petitioners' suggestion that DOD is undertaking a policy of transfer in order to thwart the jurisdiction of the courts."  Al-Anazi, 370 F. Supp. 2d at 196 n.7 (citing Dep't of Defense, Transfer of Afghani and Pakistani Detainees Complete (Mar. 15, 2004), available at http://www.defenselink.mil/releases/2004/nr20040315-0462.htm); see also supra note 4 (citing documents showing that administrative review process for considering transfers and repatriations predates Rasul and the filing of this and most other detainee habeas petitions).

clear, when the Department of Defense transfers detainees to the control of other governments, the detainees are no longer subject to the custody or control of the United States, and any subsequent confinement in the receiving country is based on the receiving government's independent decision, based on its domestic laws, that the individual should be detained. Waxman Decl. ¶ 5.  Indeed, even if the United States transfers a detainee to his home government with the understanding that, from the United States' perspective, he can be released, the home government may well subsequently take any law enforcement or investigatory action against the former detainee that it may deem appropriate under its laws.  The Court should therefore reject petitioner's suggestion that the possibility of future detention in an individual's home or another country based on that country's independent interests and determinations constitutes irreparable injury warranting an injunction.

> **B.**    **Speculation that the United States Will Defy its Own Policy by Transferring Detainees to Countries in Circumstances Where it is Believed They Will be Tortured Does Not Warrant a Preliminary Injunction**

Nor can petitioner carry his burden to show irreparable injury that is "certain and great . . . actual and not theoretical," Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985), by rife speculation that, contrary to the policies and processes attested to in the sworn declarations of high-level Executive Branch officials, the United States has designs to send petitioner to a foreign country in circumstances where he will be tortured.  Those declarations, after all, make clear that it is the policy of the United States not to repatriate or transfer a detainee to a country when the United States believes, based on a number of factors and considerations, it is more likely than not that the individual will be tortured there.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.

13

This policy is implemented through a process that contains several levels of precautions and safeguards.  To conclude that an injunction is nevertheless necessary would require the Court to assume, without any evidence, that the United States' policy and practice is somehow a sham or pretext.  There is no valid basis for such an assumption.

Rather, as this Court previously found, respondents' sworn declarations "directly refute the petitioners' allegations of their potential torture, mistreatment and indefinite detention to which the United States will in some way be complicit."  Almurbati, 366 F. Supp. 2d at 78.  Another Judge, likewise, found that the assortment of magazine and newspaper stories relied upon by many detainee-petitioners in these cases – including petitioner here – failed to form a factual predicate justifying an injunction, noting that, among other problems with relying on such materials, "[p]etitioners [in that case] concede that none of these incidents involve the transfer of detainees out of Guantanamo."  Al-Anazi, 370 F. Supp. 2d at 190-91; see also id. at 196.  Thus, petitioner has failed to show that either the prospect of relinquishment from United States custody or unfounded speculation about possible torture in a foreign country constitute irreparable harm that must be remedied by a preliminary injunction.

## III.    PETITIONER CANNOT SHOW A LIKELIHOOD OF SUCCESS IN OBTAINING A COURT ORDER PREVENTING A TRANSFER IN ACCORDANCE WITH THE POLICIES EXPRESSED IN RESPONDENTS' DECLARATIONS

Petitioner fares no better on the second prong of the preliminary injunction analysis, which requires him to show that he is likely to succeed, following notice, in preventing a transfer from Guantanamo.

To be clear, whatever the merits of the issues currently before the D.C. Circuit in the

14

ongoing appeals in <u>Khalid v. Bush</u>, 355 F. Supp. 2d 311 (D.D.C. 2005), <u>appeals docketed</u>, Nos.

05-5062, 05-5063 (D.C. Cir. Mar. 2, 2005), and <u>In re Guantanamo Detainee Cases</u>, 355 F. Supp.

2d 443 (D.D.C. 2005), <u>appeal on petition for interlocutory appeal</u>, No. 05-5064 et al. (D.C. Cir.),

and of petitioner's claims that he is being wrongfully detained, it is not the likelihood of success

on <u>those</u> issues or claims that matters for purposes of the instant motion for preliminary

injunction.  Rather, as two Judges of this Court (who reached opposite outcomes on the bottom

line of whether to require advance notice) have agreed, the likelihood of success analysis must

focus on the legal basis for petitioners to obtain an order preventing <u>termination</u> of detention by

the United States in the manner described in the declarations submitted herewith.  <u>See</u> <u>Al-Anazi</u>,

370 F. Supp. 2d at 194 ("[T]he presence of a sound basis to challenge the legality of one's

<u>detention</u> does not at all imply that there exists a sound basis to challenge the legality of one's

<u>transfer</u>.  Put differently, the 'merits,' if you will, to be assessed for purposes of the present claim

for preliminary injunctive relief, is petitioners' challenge to their <u>transfer</u> from Guantanamo, not

to their <u>detention</u> at Guantanamo (emphasis in original)); <u>Abdah</u>, 2005 WL 711814, at *4 ("<u>if</u>

there are no circumstances under which Petitioners could obtain a court order preventing a

contemplated transfer, a preliminary injunction should not be granted" (emphasis in original)).

    Because petitioner discusses neither the preliminary injunction standard, nor any

applicable substantive law that could serve as the basis for an order prohibiting a transfer, <u>a</u>

<u>fortiori</u> his motion is completely silent on his likelihood of success on the merits of blocking a

transfer.  Indeed, there is no valid legal source of authority for such an order.  Moreover, even if

such a source existed, the Rule of Non-Inquiry, which bars judicial inquiry into the fairness of a

foreign nation's justice system and the procedures or treatment that an individual may experience

in a foreign nation, weighs heavily against petitioner's likelihood of success in contesting a transfer or repatriation.

A.    No Valid Legal Basis Exists for a Judicial Order
      Enjoining Transfer or Repatriation of an Individual
      Previously Detained by the United States as an Enemy Combatant

As discussed above in the context of irreparable harm, see supra Section II.A, protection of the Court's jurisdiction would not be an appropriate legal rationale for an order forbidding transfer or repatriation of an individual detained at Guantanamo, because relinquishment from United States custody (which occurs in every such transfer or repatriation) represents the full extent of relief that petitioners could obtain in habeas.  See Almurbati, 366 F. Supp. 2d at 80 ("[O]nce the respondents release the petitioners from United States custody . . . they will have obtained the result requested and at that point there will be no further need for this Court to maintain jurisdiction."); see also Al-Anazi, 370 F. Supp. 2d at 198.[9]  Indeed, it has been noted that, "[w]ere the Court to preserve its jurisdiction over the habeas petitions, and ultimately determine that the United States may no longer detain the petitioners, the parties and the Court would find themselves in precisely the same position in which they find themselves now – with the respondents taking steps to transfer those individuals out of United States control, and the

_____

[9] One of the previous decisions on a similar motion in another Guantanamo detainee case criticized this proposition as "overly simplistic," because "[p]etitioner ultimately seeks total freedom from all custody, not just United States custody."  Al-Marri v. Bush, Civ. A. No. 04-2035 (GK), 2005 WL 774847, at *3 n.7 (D.D.C. Apr. 4, 2005).  Whatever petitioner may ultimately seek, however, a court of the United States clearly does not have jurisdiction to award a foreign national the relief of "freedom from all custody" worldwide, in the sense of immunity from detention in his home or a third country pursuant to its own domestic laws and independent determinations.  It is beyond cavil that the courts of the United States would have no authority to interfere with any decision a foreign sovereign nation may make to detain, investigate, or prosecute its own nationals being returned to it.

petitioners compelled to come forward with some legal or evidentiary basis to prevent transfer to an 'undesirable' country."  Al-Anazi, 370 F. Supp. 2d at 196.  Thus, petitioner does not enjoy a likelihood of success in obtaining an order barring a transfer in order to "protect" the Court's jurisdiction.

Some detainee-petitioners in these cases have claimed, although no Judges have adopted as a basis for ordering relief, that any transfer or repatriation would violate certain international treaties such as the Geneva Conventions.  These claims are not valid and do not provide a basis for finding a likelihood of success in obtaining an order barring a transfer or repatriation.  The D.C. Circuit has held that "the 1949 Geneva Convention does not confer upon [a detainee] a right to enforce its provisions in court."  Hamdan v. Rumsfeld, 415 F.3d 33, 40 (D.C. Cir. 2005), cert. granted, 74 U.S.L.W. 3108 (Nov. 7, 2005).  In any event, neither this petitioner nor any others have identified any provision in any treaty that is in conflict with the United States' policy governing transfers and repatriations of individuals detained at Guantanamo by the Department of Defense, or that would be violated by a transfer or repatriation undertaken in accordance with that policy.

**B.    Separation-of-Powers Principles Militate Heavily Against Petitioner's Likelihood of Success**

Further, even if some valid claim or other legal basis existed for judicial involvement in transfer or repatriation decisions with respect to enemy combatants held abroad, or for an advance notice requirement to support and facilitate such involvement, the separation of powers would bar such relief.  "[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch."  People's Mojahedin Org. v. Dep't of State, 182 F.3d 17, 23

(D.C. Cir. 1999) (citing Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333

U.S. 103, 68 S. Ct. 431 (1948)); see also Holmes v. Laird, 459 F.2d 1211, 1215 (D.C. Cir. 1972)

("In situations such as this, '[t]he controlling considerations are the interacting interests of the

United States and of foreign countries, and in assessing them [the courts] must move with the

circumspection appropriate when [a court] is adjudicating issues inevitably entangled in the

conduct of our international relations.'") (quoting Romero v. International Terminal Operating

Co., 358 U.S. 354, 383, 79 S. Ct. 468, 486 (1959)).[10]  If the Court were to entertain petitioner's

claims to a right to contest repatriation or removal from Guantanamo, it would insert itself into

the most sensitive of diplomatic matters.  Judicial review of a transfer or repatriation decision

could involve scrutiny of United States officials' judgments and assessments on the likelihood of

torture in a foreign country, including judgments on the reliability of information and

representations or the adequacy of assurances provided, and confidential communications with

the foreign government and/or sources therein.  Prosper Decl. ¶¶ 9-12.  Disclosure and/or judicial

review of such matters could chill important sources of information and interfere with our ability

to interact effectively with foreign governments.  Prosper Decl. ¶¶ 9-12; Waxman Decl. ¶ 8.  In

particular, the foreign government in question, as well as other governments, would likely be

reluctant to communicate frankly with the United States in the future concerning torture and

---

[10] In Holmes, U.S. citizen servicemembers sued to prevent the United States government
from surrendering them to West German authorities to serve sentences for convictions by West
German courts on criminal charges relating to their conduct while stationed in West Germany.
Even in this situation involving U.S. citizens, the District Court and D.C. Circuit rejected the
plaintiffs' invitation to examine the fairness of their treatment by the West German courts and
declined to enjoin the transfer, the latter court holding that "the contemplated surrender of
appellants to the Federal Republic of Germany is a matter beyond the purview of this court."  459
F.2d at 1225.

mistreatment concerns.  Prosper Decl. ¶¶ 10, 12.  This chilling effect would jeopardize the

cooperation of other nations in the war on terrorism.  Prosper Decl. ¶¶ 10, 12; Waxman Decl. ¶ 8.

      Because of these foreign relations implications, as developed most extensively in the

analogous context of extradition, courts have uniformly eschewed inquiry into "'the fairness of a

requesting nation's justice system'" and "'the procedures or treatment which await a surrendered

fugitive in the requesting country.'"  <u>United States v. Kin-Hong</u>, 110 F.3d 103, 110 (1st Cir.

1997) (quoting <u>Arnbjornsdottir-Mendler v. United States</u>, 721 F.2d 679, 683 (9th Cir. 1983));

<u>see</u> <u>Al-Anazi</u>, 370 F. Supp. 2d at 194 (holding that this "well-established line of cases in the

extradition context" "counsel[s] even further against judicial interference").  This principle is

sometimes called the Rule of Non-Inquiry.  For example, in <u>Ahmad v. Wigen</u>, 910 F.2d 1063 (2d

Cir. 1990), a United States citizen was extradited from the United States to Israel to stand trial

for an alleged terrorist attack.  While the district court upheld the extradition only after receiving

testimony and extensive documentation concerning Israel's law enforcement system and

treatment of prisoners, the Second Circuit held that such inquiry was wholly improper.  "The

interests of international comity are ill-served," the Second Circuit explained, "by requiring a

foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its

laws and the manner in which they are enforced."  <u>Id.</u> at 1067.  "It is the function of the Secretary

of State to determine whether extradition should be denied on humanitarian grounds."  <u>Id.</u>

<u>Accord</u> <u>Escobedo v. United States</u>, 623 F.2d 1098, 1107 (5th Cir. 1980) (refusing to bar

extradition based on allegations that appellant "may be tortured or killed if surrendered to

Mexico," because "the degree of risk to [Escobedo's] life from extradition is an issue that

properly falls within the exclusive purview of the executive branch" (internal quotation marks

19

omitted)); <u>Peroff v. Hylton</u>, 563 F.2d 1099, 1102 (4th Cir. 1977); <u>Matter of Extradition of</u>

<u>Sandhu</u>, 886 F. Supp. 318, 321-23 (S.D.N.Y. 1993); <u>Hoxha v. Levi</u>, 371 F. Supp. 2d 651, 659-61

(E.D. Pa. 2005) (holding that allegations that individual would be tortured after extradition to

Albania were solely for the Secretary of State to weigh, and not an appropriate subject for

judicial inquiry), <u>on appeal</u>, No. 05-3149 (3d Cir.).  <u>See generally</u> Jacques Semmelman, <u>Federal</u>

<u>Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings</u>,

76 Cornell L. Rev. 1198 (1991).

The force of these principles is not diminished by the fact that petitioner seeks judicial

review of any kind of transfer, repatriation or removal from Guantanamo, rather than merely

trying to block an extradition.  The considerations that underlie the Rule of Non-Inquiry are not

endemic to the specific context of extradition, but instead rest on the constitutional separation of

powers.[11]  <u>See</u> <u>Matter of Requested Extradition of Smyth</u>, 61 F.3d 711, 714 (9th Cir. 1995)

---

[11] Some petitioners in Guantanamo detainee habeas cases have argued that the Rule of
Non-Inquiry is contingent on the existence of an extradition treaty, citing <u>In re Extradition of
Howard</u>, 996 F.2d 1320, 1329 (1st Cir. 1993).  However, the applicable language from <u>Howard</u>
was characterized as dicta by the First Circuit in a subsequent decision.  <u>Kin-Hong</u>, 110 F.3d at
111 n.12.  In that later case, while pretermitting the question "[w]hether the doctrine is
constitutionally mandated" as "immaterial here," the First Circuit cited an analogy to the act-of-
state doctrine and described the doctrine using language imbued with constitutional significance.
<u>See id.</u> at 110-11 ("The rule of non-inquiry, like extradition procedures generally, is shaped by
concerns about institutional competence and by notions of separation of powers.  It is not that
questions about what awaits the relator in the requesting country are irrelevant to extradition; it is
that there is another branch of government, which has both final say and greater discretion in
these proceedings, to whom these questions are more properly addressed.") (citation omitted).

Moreover, to the extent that petitioner may contend that the only possible way to
repatriate him would be pursuant to an extradition treaty or statute, such a contention would be
wholly without merit.  <u>See</u> <u>United States v. Alvarez-Machain</u>, 504 U.S. 655, 112 S. Ct. 2188
(1992); <u>Ker v. Illinois</u>, 119 U.S. 436, 7 S. Ct. 225 (1886); <u>Coumou v. United States</u>, 107 F.3d
290, 295 (5th Cir. 1997) (reversing lower court's holding, 1995 WL 2292, *11 (E.D. La. Jan. 3,
(continued...)

20

("Undergirding this principle is the notion that courts are ill-equipped as institutions and ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into and pronouncements about the workings of foreign countries' justice systems."); <u>Sandhu</u>, 886 F. Supp. at 321 ("The rule of non-inquiry arises from recognition that the executive branch has exclusive jurisdiction over the country's foreign affairs."); <u>cf.</u> <u>Holmes</u>, 459 F.2d at 1219-23 (holding, in a non-extradition context, that considerations similar to those embodied in the Rule of Non-Inquiry made it improper for the Judiciary to examine allegations of unfairness in a foreign nation's trial of a U.S. citizen). Thus, petitioner cannot turn to the courts to second-guess Executive judgments about matters such as custodial conditions and/or the adequacy of legal procedures in a foreign country, as well as the credibility and adequacy of a foreign government's assurances. <u>Cf.</u> <u>People's Mojahedin</u>, 182 F.3d at 23 (expressing reluctance of courts to interfere in matters "'for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry'" (quoting <u>Chicago & Southern</u>, 333 U.S. at 111, 68 S. Ct. at 436)).

***

Thus, there is no basis in law for an injunction requiring advance notice of an upcoming transfer or repatriation in order to enable petitioner to seek a judicial order blocking it. Neither the Court's habeas corpus jurisdiction nor any other legal authority supports the notion of ordering custody that the United States wishes to relinquish to nevertheless be artificially and

---

[11](...continued)
1995), that "[n]or did the United States, or its officers or agents, have the discretion to deliver an arrested person to the government of Haiti, unless the extradition laws of the United States were followed").

indeterminately prolonged purely to preserve a live case for the Court.  And, apart from the absence of affirmative legal authority, separation of powers considerations and foreign relations sensitivities preclude a judicial inquiry in which this Court would substitute its judgment regarding the appropriateness of repatriation for that of the appropriate Executive Branch officials.

## IV.    AN INJUNCTION REQUIRING ADVANCE NOTICE WOULD TRAMPLE ON THE SEPARATION OF POWERS

It is undisputed that the sole reason petitioner seeks advance notice is to enable him to seek an order blocking or changing a transfer or repatriation decision that the Executive would already have made after consultation and coordination with the foreign government in question. See Petr's Mot. ¶ 4 (conceding that the purpose of the notice is to "permit counsel to contest such removal").  Such an advance notice requirement foreshadows judicial review and intervention that would be accompanied by the attendant harms discussed in the declarations of Deputy Assistant Secretary Waxman and then Ambassador Prosper submitted herewith.  See Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12.  Even if such judicial review did not ultimately result in an injunction against transfer, the mere inquiry into the United States' dialogue with foreign nations and into the terms of a transfer and any assurances that may have been obtained would cause grave harm.  See supra Section III.B (describing interests of international comity that underlie the Rule of Non-Inquiry); Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12.  Moreover, the very prospect of judicial review, as exemplified by an advance notice requirement, causes separation-of-powers harm by undermining the ability of the Executive Branch to speak with one voice in its dealings with foreign nations.  See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 381, 120 S. Ct.

2288, 2298 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with other governments").  An advance notice requirement, after all, would make the results of diplomatic dialogue between the Executive Branch and a foreign government regarding repatriations or transfers inherently contingent because the effective acquiescence of another Branch (i.e., the Judiciary) would be required for a transfer or repatriation to go forward, and such a requirement would also inject delays into future transfers.  These harms weigh heavily against entry of a preliminary injunction.

## V.    AN INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST

The public interest favors allowing the Executive Branch, which is constitutionally vested with the authority both to conduct military functions, such as detention of enemy combatants for the duration of hostilities, and to engage in foreign relations, to act without undue intrusion within its constitutional sphere of responsibility.[12]  As a Judge of this Court previously held:

> [T]here is a strong public interest against the judiciary needlessly intruding upon the foreign policy and war powers of the Executive on a deficient factual record. Where the conduct of the Executive conforms to law, there is simply no benefit – and quite a bit of detriment – to the public interest from the Court nonetheless assuming for itself the role of a guardian ad litem for the disposition of these detainees.  See People's Mojahedin Org., 182 F.3d at 23 ("[I]t is beyond the

---

[12] While two Judges, in granting preliminary injunctions, have relied on the general statement that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights," G&V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994), cited in Al-Marri, 2005 WL 774847, at *6; Abdah, 2005 WL 711814, at *6, that formulation merely begs the question what violations of constitutional rights (assuming arguendo that enemy aliens detained at Guantanamo possess rights under the United States Constitution, but see Khalid v. Bush, 355 F. Supp. 2d 311, 320-23 (D.D.C. 2005)) are present or imminent here and stand to be prevented by an injunction.  As discussed above, respondents' policy and practices governing transfer and repatriation of Guantanamo detainees plainly do not violate any rights petitioner may have, constitutional or otherwise.  The public interest surely does not support assuming without any foundation that Executive Branch officials are wont to engage in constitutional violations unless supervised by the courts.

23

judicial function for a court to review foreign policy decisions of the Executive Branch.").

Al-Anazi, 370 F. Supp. 2d at 199. Here, as well, the public interest disfavors an injunction.

## **CONCLUSION**

For the reasons stated above, respondents respectfully request that petitioner's motion be

denied.[13]

Dated: December 2, 2005                    Respectfully submitted,

                                           PETER D. KEISLER
                                           Assistant Attorney General

                                           KENNETH L. WAINSTEIN
                                           United States Attorney

                                           DOUGLAS N. LETTER
                                           Terrorism Litigation Counsel

                                           [*signature block continued on next page*]

---

[13] Petitioner requests, as an alternative to advance notice, that the Court order that upon any transfer of petitioner, respondents provide a declaration advising the Court of any transfer and certifying certain facts, as ordered in Almurbati. Respondents do not believe that this relief is necessary. In sworn declarations by high-level officials, respondents have explained in detail the policies and practices governing transfers and repatriations from Guantanamo, including any future transfer of the petitioner. Moreover, upon any repatriation or transfer of petitioner respondents would notify the Court of the fact of such repatriation or transfer, with or without such an order.

   /s/ Robert J. Katerberg
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
JAMES J. SCHWARTZ
PREEYA M. NORONHA
ROBERT J. KATERBERG
ANDREW I. WARDEN
NICHOLAS J. PATTERSON
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-4107
Fax:  (202) 616-8470

25